Commonwealth v. Feyenord.

COMMONWEALTH vs. KENTON W. FEYENORD.

No. 02-P-1260.

Worcester. November 6, 2003. - October 1, 2004.

Present: GREENBERG, BERRY, & McHUGH, JJ.

Further appellate review granted, 443 Mass. 1101 (2004).

*Controlled Substances. Statute,* Construction. *Search and Seizure,* Motor
vehicle, Threshold police inquiry, Trained dog. *Constitutional Law,* Search
. and seizure, Investigatory stop. *Threshold Police Inquiry.*

On a criminal defendant's pretrial motion to suppress evidence resulting from
a traffic stop, the judge correctly found that the police officer properly
stopped the defendant for a traffic offense (operation of a motor vehicle
during the daytime with only one headlight) and that the officer was justi-
fied, in the circumstances, in asking the defendant to get out of his vehicle;
further, in light of this court's conclusions that a police dog's subsequent
sniffing of the air outside the defendant's car did not constitute a search
under either the Fourth Amendment to the United States Constitution or
art. 14 of the Massachusetts Declaration of Rights, and that the defendant's
brief detention while the dog was summoned to the scene and conducted
its investigation did not amount to an impermissible seizure of the
defendant, the judge correctly denied the defendant's motion to suppress.
[204-210] GREENBERG, J., dissenting.

INDICTMENT found and returned in the Superior Court Depart-
ment on November 9, 2000.

A pretrial motion to suppress evidence was heard by *Timothy
S. Hillman,* J., and the case was tried before him.

*Michael J. Traft* for the defendant.

*Michelle R. King,* Assistant District Attorney, for the
Commonwealth.

McHUGH, J. After a State police officer noticed an inoperable
headlight on the car driven by the defendant, Kenton Feyenord,
the officer stopped the car. Soon after the stop, the officer found
169 grams of cocaine concealed in the trunk. Before his trial on
resulting charges of trafficking in cocaine (G. L. c. 94C,
§ 32E[*b*][3]), the defendant, invoking both the Fourth Amend-
ment to the Constitution of the United States and art. 14 of the

Massachusetts Declaration of Rights, filed a motion to suppress all physical evidence taken from the vehicle and all statements made to the officer prior to the search.[1] His motion was denied. The defendant was subsequently convicted of trafficking cocaine, in the amount of one hundred to two hundred grams, on a joint venture theory. Now he appeals, claiming that the denial was error. We affirm.[2]

The events relevant to the motion to suppress began when State police officer William Pinkes, while on patrol at 5:45 P.M. on May 4, 2000, noticed a car behind him with its right headlight illuminated and its left headlight out. It was daylight at the time and there were no visibility hazards. As some motorists are wont to do, however, the driver had turned on the headlights prior to nightfall.

Pinkes pulled his marked cruiser to the side of the road and allowed the vehicle to pass him. After the car passed, he pulled behind it, and signaled the driver to stop. As Pinkes walked toward the stopped vehicle, he saw the defendant, a bearded black man, seated behind the wheel and a passenger, subsequently identified as "Junior" Cox, sans seat belt, sitting beside him.

Pinkes asked the defendant for his license and registration. The defendant was unable to produce a valid driver's license

---

[1]At the motion hearing, trial counsel focused most of his attention on the statements, none of which had been preceded by Miranda warnings. The defendant has not appealed from the portion of the judge's ruling that rejected the defendant's Miranda claim.

[2]The defendant also claims that the evidence was insufficient to support his conviction and that the jury instructions on joint venture were impermissibly confusing. The defendant's control of the automobile where the drugs were found, the testimony of the automobile's registered owner to the effect that the drugs were not in the car when she loaned it to the defendant, the defendant's possession of cash in denominations consistent with drug sales, and his evasive behavior during the stop were sufficient facts to create a jury question as to his guilt either as a principal or as a joint venturer. See, e.g., *Commonwealth* v. *Lopez*, 31 Mass. App. Ct. 547, 550-551 (1991).

The instructions were similar to those commended in *Commonwealth* v. *Echavarria*, 428 Mass. 593, 598 n.3 (1998), and because they adequately explained the applicable law, the judge was not required to give the instruction the defendant requested regarding his prior association with Cox, the passenger who was riding in the car the defendant was driving. See *Commonwealth* v. *Owens*, 414 Mass. 595, 607 (1993); *Commonwealth* v. *Sinai*, 47 Mass. App. Ct. 544, 547 (1999).

but did show Pinkes a proper vehicle registration certificate in the name of a person he claimed was his aunt. As the defendant produced the registration, Pinkes noticed that the defendant was nervous and that his hands were shaking. In response to Pinkes's request, Cox produced a valid identification card showing him to be a Jamaican citizen. When Pinkes asked the defendant for his name, however, the defendant's response was unintelligible.

Following the unintelligible response, Pinkes ordered the defendant to get out of the vehicle so he could question him apart from Cox, who remained inside the vehicle. The ensuing exchange between Pinkes and the defendant occurred while the two were standing between the front of Pinkes's cruiser and the rear of the defendant's car. Pinkes began the conversation by again asking the defendant for his name. This time, the defendant replied that his name was Kadari Bowen.[3] He provided a social security number and a birth date of June 9, 1978, but stumbled when asked for his age. At some point, the defendant said he was licensed to drive in New York but, as noted, was unable to produce any driver's license.

Leaving the defendant between the two parked cars, Pinkes went to the driver's side of the defendant's car and asked Cox who the defendant was and how long Cox had known him. Cox replied that, although he had known the defendant for two to three years, he only knew him as "Pat."

Armed with that information, Pinkes returned to the defendant and asked him how long he had known Cox. The defendant stated that Cox was his brother-in-law, the father of his sister's child, and that the defendant had known him for approximately twelve years. At that, Pinkes returned to the side of the car and asked Cox for the name of the defendant's sister. Cox told Pinkes that he did not know any of the defendant's family.

Pinkes then inquired of the defendant about the pair's intended destination. The defendant said that he and Cox were on their way to Putnam, Connecticut, to visit one of the defendant's friends. Although he did not know the friend's address or telephone number, the defendant said he intended to

---

[3]At the motion hearing, the defendant testified that he knew there was an outstanding warrant for his arrest and, consequently, gave Pinkes the name Kadari Bowen, who was in fact his cousin.

telephone the friend for directions when he got a little closer to Putnam. Cox, on the other hand, told Pinkes that the pair was headed for Brooklyn, New York.

At that point, Pinkes decided that something meriting further investigation was afoot. He placed the defendant in the back of his cruiser while he contacted State police Officer James Devlin, who was assigned to the area as the handler of Heiko, a police dog trained to detect marijuana, cocaine, hashish, and heroin. Pinkes asked Devlin to come to the scene.[4] Between five and ten minutes had elapsed between the stop and Pinkes's call to Devlin. The defendant was not handcuffed as he sat in the rear of Pinkes's cruiser and Pinkes informed him that he was not under arrest. Pinkes also told him, however, that he was not free to leave the cruiser.

Devlin and Heiko arrived at the scene ten or fifteen minutes after Devlin received Pinkes's call. After arriving, Devlin had Heiko walk around the exterior of the defendant's vehicle. Heiko "alerted" in an area at the left rear of the trunk.[5] The officers then placed Heiko near the inside of the trunk, where he again "alerted," this time in an area near the left rear tail light. Upon inspection, the police officers found a gray plastic bag containing a digital scale and a black bag holding a quantity of what looked like, and turned out to be, cocaine. At that point, the defendant and his passenger were arrested and brought to the State police barracks.

Based on those facts, the defendant makes three related arguments attacking the validity of the search. First, he contends that Pinkes was not authorized to stop him for operating the car during daylight hours with only one functioning headlight.

[4]Pinkes was not asked, and did not volunteer, why he summoned Devlin to the scene. Devlin had worked with Heiko for five years and had used him for drug detection in excess of 400 times. Devlin, or other officers, had found drugs about eighty percent of the time after Heiko "alerted" to an area. Devlin had never seen Heiko "alert" on substances other than narcotics.

[5]Devlin testified that, upon seeing the "alert," he told the defendant that he had probable cause to use the dog to search inside the vehicle and, on this basis, obtained the defendant's permission to search the car with the dog. The motion judge made no findings of fact one way or the other regarding the defendant's consent but, as we can resolve the case on other grounds, we proceed as if no consent had been obtained. Compare, e.g., Commonwealth v. King, 429 Mass. 169, 181 (1999).

Second, he claims that Pinkes did not have a lawful basis for ordering him to get out of the vehicle. Finally, the defendant claims that his detention at the scene and the dog's exterior sniffing of his car amounted to an impermissible search, seizure, or both.[6]

1. *The stop.* The motion judge determined that operating a motor vehicle with only one headlight, during the daytime, was a traffic violation and warranted the stop. The defendant argues that there was no traffic violation. He focuses on G. L. c. 90, § 7, which, among other things, requires that headlamps be illuminated from one-half hour after sunset to one-half hour before sunrise. He concedes that headlamps must be illuminated if weather conditions during daylight hours create a visibility hazard. Absent this circumstance, however, his position is that no traffic offense had occurred and no stop was justified.

The defendant's argument is unpersuasive. General Laws c. 90, § 7, states that "[e]very motor vehicle operated in or upon any way shall be provided with . . . suitable lamps." G. L. c. 90, § 7, as appearing in St. 1978, c. 439, § 1. "Lamps" is in the plural and the requirement for "suitable lamps" depends neither on visibility conditions nor on the time of day during which the vehicle is operated.

The statute does not define the word "suitable." However, the sentence immediately after the sentence containing the "suitable lamps" requirement says that:

> "[e]very automobile operated during the period from one half an hour after sunset to one half an hour before sunrise, and during any other period when visibility is reduced by atmospheric conditions so as to render dangerous further operation without lights being displayed, shall display at

---

[6]The defendant does not argue that the police officers had no right to search the interior of the trunk after the dog's exterior "alert." See *United States* v. *Quinn*, 815 F.2d 153, 159 (1st Cir. 1987) (where dog indicates presence of controlled substance in car, there is probable cause to search the car); *Commonwealth* v. *Motta*, 424 Mass. 117, 122-124 (1997) (warrantless search of automobile is permissible under Fourth Amendment and art. 14 where automobile is stopped in a public place with probable cause that it contains contraband); *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 324 (2001) (where dog indicates presence of narcotics in rear of car there is probable cause to search the car). See also *Chambers* v. *Maroney*, 399 U.S. 42, 48-51 (1970).

least two lighted white headlamps with at least one mounted at each side of the front of the vehicle."

G. L. c. 90, § 7, as appearing in St. 1978, c. 439, § 1. See G. L. c. 90, § 7A (requiring annual inspection to insure that, inter alia, "lights" are in good working order); 540 Code Mass. Regs. § 22.05 (1996) (specifying the number of feet in front of vehicle lamps must be capable of illuminating). When the statutory provisions are "construed together so as to constitute a harmonious whole consistent with the legislative purpose," *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975), we think that, at a minimum, the "suitable" lamps with which vehicles must be equipped are lamps capable of meeting the statutory requirements for illumination at night and during periods of reduced visibility, i.e., "two lighted white headlamps with at least one mounted at each side of the front of the vehicle." See G. L. c. 90, § 7. Lamps capable of being lighted manifestly must be in operating order and one of the lamps on the defendant's car was not. Therefore, the defendant's vehicle was not "provided with" "suitable" lamps and Pinkes was authorized to stop it. See, e.g., *Commonwealth* v. *Riche*, 50 Mass. App. Ct. 830, 833 (2001).

2. *The exit order.* When Pinkes stopped the defendant's car, Pinkes knew only that it was not properly equipped for travel on the Commonwealth's roads. Because the stop was justified, however, he was permitted to "take reasonable precautions for [his] own protection." "Such precautions may include ordering occupants out of a car for questioning," *Commonwealth* v. *Ferrara*, 376 Mass. 502, 505 (1978), if the officer who makes the stop has reasonable concern for his own safety or that of others. See *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 660-669 (1999), *S.C.*, 432 Mass. 613 (2000), *S.C.*, 441 Mass. 1007 (2004). Given the wide variety of rapidly evolving circumstances an officer may face, "not . . . much [is required] for a police officer to establish a reasonable basis to justify an exit order . . . based on safety concerns." *Id.* at 664.

Here, Pinkes was justified in ordering the defendant out of the car when he failed to produce a valid driver's license and produced a registration certificate in the name of another. Those

circumstances, combined with the defendant's nervous manner-
isms, suggested, at the very least, that "something was amiss,"
*Commonwealth* v. *Heon*, 44 Mass. App. Ct. 254, 257 (1998),
and gave rise to "a suspicion of other offenses, such as
automobile theft." *Commonwealth* v. *Lantigua*, 38 Mass. App.
Ct. 526, 528 (1995). Particularly because Pinkes was alone and
outnumbered, the circumstances "reasonably [gave] rise to . . .
and justifie[d] [Pinkes's] heightened precautions for [his] own
safety." *Ibid.* See *Commonwealth* v. *Kitchings*, 40 Mass. App.
Ct. 591, 596-597 (1996); *Commonwealth* v. *Riche, supra* at 834.
In sum, the exit order was permissible.

3. *The exterior sniff of the vehicle.* The final question is
whether the exterior sniff of the vehicle was improper either
because Pinkes impermissibly extended the length of time he
was holding the defendant at the scene awaiting the dog's
arrival, or because the dog's sniff amounted to an impermissible
search of the defendant's automobile without probable cause.

We deal first with the issue of whether the sniff was a search.
If so, Pinkes required either a warrant or probable cause and an
exception to the warrant requirement. *United States* v. *Place*,
462 U.S. 696, 706-707 (1983). However, insofar as the Fourth
Amendment to the Constitution of the United States is
concerned, the sniff was not a search. *Id.* at 707. See *Indianapo-
lis* v. *Edmond*, 531 U.S. 32, 40 (2000); *Commonwealth* v.
*Sinforoso*, 434 Mass. at 324; *Commonwealth* v. *Pinto*, 45 Mass.
App. Ct. 790, 793 (1998). And, although no decided case has
thus far said so, we think the same result obtains under art. 14
of the Massachusetts Declaration of Rights.

"[W]hether a search in the constitutional sense has taken
place . . . turns on whether the police conduct has intruded on
a constitutionally protected reasonable expectation of privacy."
*Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991) (cita-
tion omitted). "[A] constitutionally protected reasonable
expectation of privacy" has a subjective and an objective
component. *Ibid.* The subjective element turns on "whether the
defendant has manifested a subjective expectation of privacy in
the object of the search," and the objective element turns on
"whether society is willing to recognize that expectation as
reasonable." *Ibid.* The defendant bears the burden of establish-

ing both elements, *ibid.*, and, on review, we treat the issue as a question of law. See *Commonwealth* v. *Starr*, 55 Mass. App. Ct. 590, 593 (2002).

Nothing in the record suggests that the defendant subjectively expected that the odors his automobile was emitting that evening, odors detectable only by a trained dog, were surrounded by a zone of privacy. By itself, that void is sufficient to defeat his claim that a search occurred. See, e.g., *Commonwealth* v. *Ortega*, 59 Mass. App. Ct. 217, 221-222 (2003), *S.C.*, 441 Mass. 170 (2004).

But even if the defendant had such an expectation, the dog's activity did not amount to a search. From the mix of smells escaping the defendant's car, the dog was trained to "alert" only to the odor of marijuana, cocaine, hashish, and heroin.[7] In other words, the presence or absence of the dog's visible reaction to what he smelled

> "disclose[d] only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the [automobile], the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure."

*United States* v. *Place*, 462 U.S. at 707. Compare, e.g., *Kyllo* v. *United States*, 533 U.S. 27, 38-39 (2001).

Under the principles to which we have long adhered, therefore, the dog's sniff and resulting "alert" would constitute a search only if society were prepared to say that the defendant

---

[7] We recognize that the mere fact that the smell to which the dog "alerted" was outside the defendant's automobile is not dispositive of the question whether a search occurred. See, e.g., *Kyllo* v. *United States*, 533 U.S. 27, 33-39 (2001).

was reasonable in his subjective expectation of privacy in the odor of cocaine emanating from his car. We think that society is wholly unprepared and unwilling to take that step. See *United States* v. *Morales-Zamora*, 914 F.2d 200, 205 (10th Cir. 1990).

We recognize that there may be circumstances under which a canine sniff would constitute a search. "The question always to be asked is whether the use of a trained dog intrudes on a legitimate expectation of privacy." *United States* v. *Thomas*, 757 F.2d 1359, 1366 (2d Cir.), cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819 (1985). For that reason, use of a dog to, say, sniff the body of a person raises issues very different from use of a dog to sniff luggage or the exterior of a car. The issues are different not because society is prepared to recognize an expectation of privacy in the odor of contraband concealed upon a person, as opposed to the odor of contraband concealed in a car, but because the very act of sniffing a person, and the touching that may accompany that sniffing, may be degradingly intrusive. See *Horton* v. *Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 479 (5th Cir. 1982), cert. denied, 463 U.S. 1207 (1983); *B.C.* v. *Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1266 (9th Cir. 1999); *United States* v. *Kelly*, 302 F.3d 291, 293 n.1 (5th Cir.), cert. denied, 537 U.S. 1094 (2002); *Merrett* v. *Moore*, 58 F.3d 1547, 1553 (11th Cir. 1995), cert. denied, 519 U.S. 812 (1996). At least one circuit court has concluded that a dog sniffing at the door of an apartment produces a similar intrusion. *United States* v. *Thomas, supra* at 1367. But even if canine drug detection in other settings is intrusive enough to constitute a search, that kind of intrusion simply is not present when a dog sniffs the exterior of an automobile. Consequently, sniffs of that kind are not searches under art. 14 any more than they are under the Fourth Amendment, and neither probable cause nor reasonable suspicion was required before bringing the dog to the scene.

Many of the cases dealing with dogs and their discovery of drugs secreted in automobiles and trucks, however, do not turn solely on the question whether the dog's investigation amounted to a search. Instead, the cases turn on the second question of impropriety the defendant raises, namely, whether the defendant's detention for the length of time required for a dog-

assisted drug investigation following a routine traffic stop unreasonably and impermissibly extended the stop's scope. See *Commonwealth* v. *Sinforoso*, 434 Mass. at 325-326 & n.5. See also *United States* v. *Quinn*, 815 F.2d 153, 159-160 (1st Cir. 1987); *United States* v. *Morales-Zamora*, 914 F.2d at 202-203; *United States* v. *Gregory*, 302 F.3d 805, 809-810 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003); *People* v. *Caballes*, 207 Ill. 2d 504, 509 (2003), cert. granted, 541 U.S. 972 (2004); *Bradshaw* v. *State*, 759 N.E.2d 271, 273-274 (Ind. App. 2001); *State* v. *Wiegand*, 645 N.W.2d 125, 134-135 (Minn. 2002).

In one way or another, cases that undertake to examine the nexus between the purpose for which the stop was effected and the scope of the resulting detention and investigation typically use an analytical model drawn from the basic principle found in *Terry* v. *Ohio*, 392 U.S. 1 (1968). Our dissenting colleague does likewise. Under *Terry*, police officers who lack probable cause to make an arrest may nevertheless stop and detain a citizen if, and to the extent that, their action is justified at its inception and the police activity following the stop is reasonably related in scope to the circumstances that justified the stop in the first place. *Id.* at 19-20. Our own cases follow that model by requiring police officers to allow motorists they stop for routine motor vehicle infractions to proceed as soon as the officers have satisfied the purposes for which they effected the stop unless events occurring thereafter provide a basis for extending the stop's duration or increasing the investigation's scope. See *Commonwealth* v. *Bacon*, 381 Mass. 642, 644 (1980); *Commonwealth* v. *King*, 389 Mass. 233, 243-244 (1983); *Commonwealth* v. *Crowley*, 29 Mass. App. Ct. 1, 4-5 (1990).

In this case, however, the *Terry* model is inapplicable because there was probable cause to arrest the defendant before Pinkes summoned the dog. Pinkes's questioning revealed that the defendant held a New York driver's license but did not have that license in his possession. Upon making that discovery, Pinkes was authorized by G. L. c. 90, § 21, to arrest the defendant for violating G. L. c. 90, § 10, which, among other things, requires out-of-State drivers to have their licenses in their possession while driving on the roads of Massachusetts. See generally *Commonwealth* v. *Lantigua*, 38 Mass. App. Ct. at 528.

To be sure, Pinkes did not arrest the defendant for nonpossession of a license, choosing instead to hold him at the scene while he summoned the dog. The record does not tell us what Pinkes would have done if the dog had smelled nothing of interest. But no rule requires police to effect an arrest the moment they have probable cause to do so, see *Commonwealth* v. *Celestino*, 47 Mass. App. Ct. 916, 918 (1999); cf. *Commonwealth* v. *Moscat*, 49 Mass. App. Ct. 622, 624 (2000), nor does any rule suggest that police are prohibited from briefly detaining a person who they have probable cause to arrest while they decide whether to arrest the person or let her proceed. Arrest, of course, triggers a series of important, formalized procedural rights, see generally, e.g., *Jenkins* v. *Chief Justice of the Dist. Ct. Dept.*, 416 Mass. 221, 232-238 (1993); *Commonwealth* v. *Morse*, 427 Mass. 117, 123 (1998), and police officers cannot use detention without arrest as a device for avoiding that trigger. But the approximately thirty-minute detention involved here displayed no effort to evade formality and it left open the possibility that, if the dog finished its investigation without incident, no arrest would follow. To hold that the defendant's detention was unlawful because the police did not arrest him before the investigation began would turn an arrest into a constitutional safeguard against brief detention. We have described that kind of result as "odious," see *Commonwealth* v. *Skea*, 18 Mass. App. Ct. 685, 694 (1984), for it creates incentives wholly inconsistent with the constitutional interests the rules governing detention without arrest are designed to serve.

In sum, Trooper Pinkes properly stopped the defendant for a traffic offense and asked him to get out of his vehicle. The police dog's subsequent sniffing of the air outside the defendant's car was not a search and the defendant's brief detention while the dog was summoned to the scene and conducted his inquiry did not amount to an impermissible seizure of the defendant. The judge, therefore, rightly denied his motion to suppress.

*Judgment affirmed.*

GREENBERG, J. (dissenting). I strongly disagree with that por-

tion of the majority opinion that concludes, as matter of law, that the defendant was not subjected to an illegal detention. At issue here is whether police officers, after concluding a routine traffic and investigatory stop, may prolong the motorist's detention to employ drug-sniffing canines without the requisite reasonable suspicion of narcotics trafficking. Put another way, the question is "whether [the officer's action] was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry* v. *Ohio*, 392 U.S. 1, 19-20 (1968). It is undisputed that the traffic stop was properly initiated in this case. Thus, we need only examine the second part of the *Terry* test concerning the reasonableness of the officer's conduct. The Commonwealth has the burden of establishing that the conduct remained within the scope of the stop. *Florida* v. *Royer*, 460 U.S. 491, 500 (1983); *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985).

Here, the Commonwealth has not offered any, let alone sufficient, justification for detaining the defendant to implement a canine sniff. The arresting officer purposely summoned Devlin, a canine officer, who was not present at the time of the stop, to broaden the scope of the traffic stop into a drug investigation without any specific and articulable facts to support the use of a canine sniff. As the majority readily admits, the arresting officer did not arrest the defendant for nonpossession of a license, choosing instead to hold him at the scene while he summoned the dog.

There are no Massachusetts appellate decisions on this point. Opinions from other jurisdictions approaching the issue are not numerous, but they are in harmony. In *People* v. *Cox*, the Illinois Supreme Court showed awareness that although stopping the defendant for not having a rear registration light was lawful, the subsequent dog sniff was impermissible, lacking any reasonable and articulable suspicion that the defendant's vehicle contained a controlled substance. *People* v. *Cox*, 202 Ill. 2d 462, 470-471 (2002), cert. denied, 539 U.S. 937 (2003). The court held that a fifteen-minute detention after the stop was not justified in that "[a]n officer may not stall at the scene of a traffic stop until a drug-sniffing dog arrives and creates probable cause to conduct a search of a vehicle." *Id.* at 470, quoting

from *People* v. *Luna,* 322 Ill. App. 3d 855, 859 (2001). See *People* v. *Caballes,* 207 Ill. 2d 504, 509-510 (2003), cert. granted, 541 U.S. 972 (2004) (in circumstances strikingly similar to the instant case, the same Illinois court held that there was no justification for detaining a defendant stopped for a traffic violation until a canine sniff could be effectuated).

In a recent Federal traffic stop case, *United States* v. *Perkins,* the court overlooked the defendant's "nervousness," his "odd behavior" of repeating questions asked by the officer, and his possession of a Florida driver's license while claiming to live in Alabama. *United States* v. *Perkins,* 348 F.3d 965, 970-971 (11th Cir. 2003). In the absence of any evidence linking the defendant to drug-related activities, the *Perkins* court held that police officers lacked authority to call a canine officer to search the car. *Ibid.*

Here, the defendant did not have a driver's license in his possession. Thus, it was appropriate for Pinkes to make some inquiries of the defendant and the passenger. See *Commonwealth* v. *Rivera,* 33 Mass. App. Ct. 311, 314 (1992); *Commonwealth* v. *Alvarez,* 44 Mass. App. Ct. 531, 534 (1998). However, once that task was concluded, the constitutional limitation applicable to a seizure of his person was triggered. "[T]here comes a time after a temporary detention when the officer must either arrest the stopped individual or allow him to go free. . . . [E]ven though the investigation has proved inconclusive, the officer must then disengage the individual from official confrontation." *People* v. *Williams,* 63 Mich. App. 398, 404 (1975).

The chain of logic has to be as follows. Once Pinkes determined that the defendant was an unlicensed operator, he had two choices: either arrest him and tow the vehicle for safekeeping or issue him a citation for the offense and permit his passenger, if licensed, to drive both of them to their destination.[1] Pinkes chose neither of these routes, but rather a canine investigation, a route that was not proportional to the reasonable suspicion generated by the evidence on the record.

By contrast, *Commonwealth* v. *Sinforoso* is a good example

---

[1] Although not well developed at the motion hearing, there was a suggestion that the passenger possessed an international driver's license which was inside his luggage in the trunk of the vehicle.

of an instance where an officer's conduct was proportional to the escalating suspicion provoked by specific, articulable facts. *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 323-324 (2001). During the initial request for license and registration after a properly-initiated traffic stop, the officer noticed weapons on the floor of both the driver's side and the passenger's side of the vehicle. *Id.* at 321-322. At this point, he called for back-up. *Id.* at 322. Out of concern for his own safety, he, and the other police officer who had arrived, ordered the driver and passenger out of the car and conducted patfrisks. *Ibid.*

When one of the officers returned to the vehicle to retrieve the weapons, he noticed a nonstandard switch under the dashboard. *Ibid.* Because of his training and experience, he suspected that the car might have a secret compartment, so he examined the exterior of the car and noticed that the location of the gas tank had been modified to accommodate such a compartment. *Ibid. Only then* did the officer call for the canine unit to check the car. *Id.* at 324.

In the instant case there were a few steps missing between finding reason to question the defendant further with regard to his identity, and determining that there were sufficient articulable facts to arouse reasonable suspicion of narcotics trafficking which would justify detaining the driver and passenger to call in and conduct a canine narcotics search. See *United States* v. *Perkins*, 348 F.3d at 970; *People* v. *Caballes*, 207 Ill. 2d at 509-510.

Pinkes called for the canine unit roughly five minutes after stopping the car. He did not call because he felt unsafe; if that were the case, he would have either pat frisked the defendant after asking him to exit the car or kept the defendant in the car until back-up arrived. See *Commonwealth* v. *Torres*, 433 Mass. 669, 675 (2001). Pinkes also did not see anything unusual about the car to suggest the existence of a secret compartment or a "popped out" trunk lock. See *Commonwealth* v. *Sinforoso*, *supra* at 324; *Commonwealth* v. *Valentine*, 18 Mass. App. Ct. 965, 966 (1984) (finding "popped out" trunk lock and absence of rear lights adequate stimulus for additional investigation of car once stopped). The information Pinkes had, i.e., that the headlight was out, that the driver could not produce a license,

that the driver lied about his identity, and that the driver and passenger gave inconsistent answers, supports further questioning with regard to the defendant's identity, but does not support an immediate inference of possible narcotics trafficking.

From the evidence on the record, it would have been more logical to infer, for example, that the car might have been stolen. See *Commonwealth* v. *Kimball*, 37 Mass. App. Ct. 604, 605-606 (1994). The car was registered to another owner, and the driver did not possess his license. Given that both driving without a license and stealing a car are illegal, such a situation might well prompt nervousness and dishonest responses from those in the car. Furthermore, nervousness is not sufficient to justify a pat frisk search. *Commonwealth* v. *Davis*, 41 Mass. App. Ct. 793, 796 (1996) (holding that vehicle infraction combined with nervousness and agitation not sufficient to justify protective search). See *Delaware* v. *Prouse*, 440 U.S. 648, 657 (1979); *United States* v. *Chavez-Valenzuela*, 268 F.3d 719, 728 (9th Cir. 2001).

Pinkes testified at the motion hearing that he did not even remember whether the defendant gave him the vehicle registration. Pinkes was not concerned with which possible explanations were suggested by the facts presented to him. He immediately called for a canine search. Such a reflexive response, particularly in comparison with the step-by-step escalation in *Sinforoso*, was not supported by articulable facts. See *Commonwealth* v. *Sinforoso, supra* at 323-324.

All the evidence at issue on appeal is traceable to the exploitation of the primary illegality — the unlawful detention of the defendant until the drug-detecting dog arrived at the scene. Thus, the seizure of the cocaine from the trunk should have been suppressed as fruit of the poisonous tree. See *Commonwealth* v. *McCleery*, 345 Mass. 151, 153-154 (1962); *Commonwealth* v. *Conway*, 2 Mass. App. Ct. 547, 553-554 (1974). The discovery by lawful means (and we do not so decide) of the cocaine inside the trunk's compartment was not "certain as a practical matter," *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 (1989). Accordingly, I would reverse the judge's order denying the motion to suppress.