## Commonwealth *vs.* Pedro Mateo-German.

Suffolk. October 8, 2008. - May 21, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Practice, Criminal,* Motion to suppress. *Search and Seizure,* Automobile, Probable cause. *Constitutional Law,* Search and seizure. *Controlled Substances. Probable Cause. Words,* "Community caretaking function."

A police officer who was properly engaged in a community caretaking function involving a temporarily disabled motor vehicle did not effect a seizure for constitutional purposes by requesting the criminal defendant's consent for a canine sniff of the exterior of that motor vehicle, where no action or statement by the officer communicated that the defendant would be detained involuntarily should he choose not to cooperate; therefore, the defendant's consent to the dog sniff was not involuntary as the product of an unlawful detention, and the dog's indication of the presence of narcotics in the motor vehicle, together with the defendant's behavior and the officer's observations, provided probable cause to search the car and seize the cocaine and heroin therein. [841-846] Ireland, J., dissenting, with whom Marshall, C.J., and Botsford, J., joined.

Indictments found and returned in the Superior Court Department on June 30, 2006.

A pretrial motion to suppress evidence was heard by *Robert C. Rufo,* J.

An application for leave to file an interlocutory appeal was allowed by *Cordy,* J., in the Supreme Judicial Court for the county of Suffolk.

*Garrett R. Fregault,* Assistant District Attorney (*Steven E. Gagne,* Assistant District Attorney, with him) for the Commonwealth.

*David Keighley* for the defendant.

Cowin, J. In this case a dog sniff of a temporarily disabled motor vehicle yielded discovery of heroin and cocaine within the vehicle. We must decide whether a police officer properly engaged in a community caretaking function involving the disabled automobile effected a seizure for constitutional purposes by requesting consent for a canine sniff of the exterior of that motor vehicle.

A judge of the Superior Court allowed the defendant's motion to suppress the heroin and cocaine. A single justice of this court granted the Commonwealth leave to appeal from that interlocutory order. See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). We reverse the Superior Court decision for the reasons that follow.

*Background.* We recite the essential facts as found by the motion judge, supplemented by undisputed testimony from the suppression hearing. See *Commonwealth* v. *DePeiza*, 449 Mass. 367, 368 (2007).

On June 9, 2006, at approximately 7:35 P.M., the defendant's automobile, an Acura sedan, ran out of gasoline while traveling south on Route 140, in an area where the road was a four-lane divided highway with a posted speed limit of fifty-five miles per hour. At the same time, a State trooper on routine patrol with his drug-detection police dog was driving on the highway in a marked cruiser. The trooper noticed the defendant's vehicle abruptly slow down, with its hazard lights flashing, and pull into the breakdown lane. The trooper activated the cruiser's blue lights and parked directly behind the Acura. The defendant got out of his car, indicated that he needed assistance, and approached the trooper. He said: "I'm out of gas, what should I do?" The trooper stood by the defendant while the defendant used his own cellular telephone to call a friend to bring gasoline to him.

The trooper observed that the vehicle had heavily tinted windows. However, because the front windows were rolled down, he was able to see several bottles of water, some empty and some full, in the rear of the car. The trooper also noticed an air freshener hanging from the rear-view mirror, and smelled a strong air freshener scent coming from within the automobile.

As the two men stood outside the Acura waiting for the arrival of the person bringing gasoline, the trooper engaged the defendant in conversation. The defendant appeared nervous. He told the trooper that he had been shopping for clothing at a shopping mall, but the trooper noticed no shopping bags in the passenger compartment. The defendant also told the trooper that he was unemployed and had recently moved to New Bedford from Boston. He said that he had purchased the Acura approximately seven months earlier, and that the vehicle was registered in the name of his girl friend. The trooper commented on the

Acura's special that "Fish and Wildlife" environmental registration plate, suggesting that "it must be nice to support something that you believe in." When the defendant did not respond, the trooper asked the defendant whether his girl friend was "into fish and wildlife." The defendant replied, "[Y]eah, I think so." The entire conversation took place during a period of approximately twenty to thirty minutes.

At that point, the trooper asked the defendant for his driver's license and automobile registration. The defendant produced both items from inside the Acura. The license identified the defendant, and the registration indicated that the Acura was registered to a woman in New Bedford. While the trooper conducted a computer check of the license and registration, the defendant sat in the driver's seat of the Acura. The computer check revealed that the defendant had a valid license and no outstanding warrants, and that the vehicle had not been reported stolen.

The trooper handed the license and registration back to the defendant through the passenger side window. The trooper observed the defendant's wallet on the dashboard, and a bulge in the right pocket of the defendant's pants. He asked the defendant whether he had any weapons on his person. The defendant responded affirmatively, removing a small pocket knife from the pocket of his pants and handing it to the trooper. The trooper noticed that a bulge remained in the defendant's pants pocket and inquired about it. The defendant responded that he had a "wad of cash." The trooper did not ask the defendant to produce the remaining contents of his pocket at that time.

The trooper, who had been trained in narcotics trafficking, asked the defendant whether he would consent to the trooper's police dog sniffing the exterior of the Acura. The defendant gave an affirmative response, stating that he "had nothing to hide." The defendant got out of the vehicle and stood approximately thirty feet away. The trooper retrieved his dog from the cruiser. The canine performed an exterior sniff of the car. When the dog reached the driver's side door of the Acura, it pointed its snout up toward the open driver's side window. The trooper understood the dog's actions to mean that the dog detected the scent of narcotics emanating from the Acura's interior. The trooper asked the defendant whether there were at that time, or had ever been, narcotics inside the Acura. The defendant responded that he had

friends who would borrow the vehicle on occasion and smoke marijuana in it. He told the trooper he used air freshener because he did not care for the smell of marijuana in the vehicle.

The trooper next asked the defendant whether he would consent to the dog searching the interior of the vehicle. The defendant responded that it was not a problem. The dog entered the car and indicated that it recognized the scent of narcotics under the rear passenger seat area.

After securing the dog in the cruiser, the trooper returned to the Acura, raised the rear seat, and discovered a door to a hidden compartment cut into the vehicle's gasoline tank. Inside, the trooper found packages wrapped in cellophane containing what appeared to be heroin.[1] The defendant was arrested. A search of the compartment revealed packages later determined to be of heroin and cocaine. An inventory search, conducted after the defendant was placed in custody, revealed cash in his pants pocket in the amount of $306. The defendant was indicted on charges of trafficking in 200 or more grams of heroin in violation of G. L. c. 94C, § 32E (c) (4); and trafficking in one hundred or more grams of cocaine in violation of G. L. c. 94C, § 32E (b) (3).

After an evidentiary hearing, a Superior Court judge allowed the defendant's motion to suppress the drugs. The judge ruled that, although the trooper's initial questioning of the defendant was a proper part of the community caretaking function, the trooper lacked any reasonable suspicion of criminal activity to justify further expanding the scope of inquiry. Once the trooper determined that the defendant needed no assistance, had no weapons, and had produced a valid license and registration, the trooper had no basis for further inquiry and his investigation should have terminated. The judge concluded in addition that the trooper's decision to conduct the canine sniff of the exterior of the vehicle was not reasonable. Finally, the judge ruled that the Commonwealth had not met its burden of establishing that the defendant's consent to the dog sniff was given freely and voluntarily.

*Discussion.* When reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error. *Commonwealth* v. *Eckert*, 431 Mass. 591,

---

[1]At the same time, the trooper observed the arrival of a pickup truck driven by the person bringing gasoline to the defendant.

592-593 (2000), citing *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). Although we accord substantial deference to the judge's ultimate findings, we independently review the correctness of the judge's application of constitutional principles to the facts as found. *Commonwealth* v. *Eckert, supra* at 593.

It is not contested that the encounter began as an appropriate community caretaking one. "Local police officers are charged with 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " *Commonwealth* v. *Evans*, 436 Mass. 369, 372 (2002), quoting *Cady* v. *Dombrowski*, 413 U.S. 433, 441 (1973). In carrying out the community caretaking function, a police officer may, among other things, check on a stopped motor vehicle in the breakdown lane of a highway. See *id.* at 372-373. A check by a police officer on the status of a vehicle and its occupants falls within the scope of the community caretaking function when its purpose is to protect the well-being of the vehicle's occupants and the public — and not when the purpose is the detection or investigation of possible criminal activity. See *Cady* v. *Dombrowski, supra*; *Commonwealth* v. *Knowles*, 451 Mass. 91, 95 (2008); *Commonwealth* v. *Murdough*, 428 Mass. 760, 764 (1999) (inquiry into condition of driver of vehicle stopped at highway rest area, for purpose of determining whether driver posed extreme danger to self or others, came within scope of community caretaking function). "The very limited and focused inspection of a vehicle to determine whether assistance or aid is required is a minimal intrusion on the occupant's, or owner's, expectation of privacy." *Commonwealth* v. *King*, 389 Mass. 233, 242 (1983).

A noncoercive inquiry initiated for a community caretaking purpose may ripen into a seizure requiring constitutional justification. That, however, is not what happened here. While the usual indicia of a seizure is that the suspect would not reasonably believe that he is free to leave, see *Commonwealth* v. *DePeiza*, 449 Mass. 367, 369 (2007), that formulation must be adapted when a motorist is stranded and is not free to leave for reasons wholly apart from the police conduct. In a traffic stop, prolonging the stop beyond the license and registration check and the issuance of a citation may itself transform that stop into an investigative one. Here, the police officer did not prolong the stop; the

driver had to wait for his friend to arrive with the gasoline. For a stranded driver, the inquiry is whether the driver would reasonably believe he was free to leave if the problem that caused him to be stranded were corrected.

When performing community caretaking functions involving a disabled vehicle, a police officer is justified in asking for a driver's license and registration. *Commonwealth* v. *Evans, supra* at 374-375. Such a request is a minimal intrusion on the defendant's rights and does not involve an improper seizure. *Id.* at 375. Thus, the trooper's request to examine the defendant's driver's license and registration was appropriate.

Accordingly, the officer was properly present at the scene of the disabled motor vehicle while the defendant waited for his friend to arrive with the gasoline. See *Cady* v. *Dombrowski, supra* at 441, 443; *Commonwealth* v. *Evans, supra* at 372-373. Indeed, if the officer had left earlier, as dusk approached, passing cars would not have been warned of the presence of the disabled vehicle on the side of the road by the flashing blue lights of the police cruiser, and the driver would have been stranded if his friend had not come as promised.

While awaiting the arrival of the driver's friend called to bring gasoline, the officer spoke with the driver. That conversation did not bring about a stop in the constitutional sense.[2] Similarly, the officer's various observations did not transform the encounter

---

[2] The essence of the dissent is that any inquiry that extends beyond the immediate concerns justifying the community caretaking function transforms the encounter into a stop. Here, according to the dissent, the officer could not permissibly question the defendant beyond ascertaining the defendant's problem and arranging a solution (for gasoline to be brought to him). The dissent's position is that further inquiry becomes investigative and impermissible because reasonable suspicion was lacking. The proposition is totally inconsistent with existing law on the subject. The police are entitled to interact with citizens, see *Commonwealth* v. *Evans*, 436 Mass. 369, 372 (2002), and such interaction is not considered a stop. See *Commonwealth* v. *Thomas*, 429 Mass. 403, 406 (1999) (police did not seize defendant merely by approaching him on public street and asking for his name and address); *Commonwealth* v. *Sanchez*, 403 Mass. 640, 644-645 (1988) (no seizure where police merely identified themselves, asked to speak to defendant, and requested consent to search); *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. 116, 117 (1998) ("The officer's approach without any direction to stop, coincident with his asking first the three males, and then the defendant a second time, to talk to him, did not constitute a seizure").

into a seizure. A police officer's notations of potentially suspicious behavior or of objects in plain view in the vehicle do not themselves create a constitutional stop.

Nor was the defendant seized when the officer asked him whether he would consent to a canine sniff of the exterior of the vehicle. "A person is seized by the police only when, in light of all the attending circumstances, a reasonable person in that situation would not feel free to leave." *Commonwealth* v. *DePeiza, supra* at 369. Nothing in the record supports the defendant's claim that it was reasonable for him to conclude at that point that he was no longer free to leave and that his cooperation was no longer voluntary. No action or statement by the officer communicated that the defendant would be detained involuntarily should he choose not to cooperate.

On numerous occasions we have held, in circumstances at least as coercive as these, that a suspect would reasonably understand that he was free to leave, and that therefore the encounter with the police was not a stop. See, e.g., *id.* at 368-371 (shortly after midnight, officers drove by defendant, reversed direction and drove back, called from car to engage defendant in conversation, then left car to continue encounter; held defendant free to leave until officers announced intention to conduct patfrisk); *Commonwealth* v̇. *Rock*, 429 Mass. 609, 611-612 (1999) (after nighttime shooting, officers in vehicle followed running suspects, caught up with them, asked if they could talk "for a second," and got out of police car and conversed with suspects; held not a stop because suspects free to leave); *Commonwealth* v. *Stoute*, 422 Mass. 782, 785, 789 (1996) (seizure occurs for purposes of art. 14 of Massachusetts Declaration of Rights when pursuit initiated with obvious intent to require suspect to submit to questioning). While here the defendant's vehicle was immobilized and he had little choice but to remain at the scene, the breakdown of the automobile was not the result of any police behavior and did not render the defendant's stay compulsory because of any official action. The defendant could not reasonably have believed that he would not be free to leave once his friend brought him gasoline. Therefore, he would not have believed himself in custody when the officer asked for his consent to a canine sniff of the vehicle. A seizure did not occur merely because of a noncoercive request

for consent made during a permissible encounter between a police officer and an immobilized motorist.

We turn therefore to the question of consent. The motion judge viewed the defendant's consent to the exterior dog sniff as the product of an unlawful detention and thus not voluntary. See *Commonwealth* v. *Torres*, 424 Mass. 153, 163 (1997). No consent was needed. In *Commonwealth* v. *Feyenord*, 445 Mass. 72, 73, 82 (2005), cert. denied, 545 U.S. 1187 (2006), we stated that the use of a drug-detecting dog to sniff the exterior of an automobile did not constitute a search under art. 14. "[T]he dog's sniff and resulting 'alert' would constitute a search only if society were prepared to say that the defendant was reasonable in his subjective expectation of privacy in the odor of cocaine emanating from the car. We think that society is wholly unprepared and unwilling to take that step." *Id.* at 82, quoting *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 207-208 (2004). "[T]he court correctly concludes that a dog sniff of the exterior of an automobile is likewise not a search within the meaning of art. 14 of the Massachusetts Declaration of Rights." *Id.* at 88 (Greaney, J., concurring).[3]

Once the dog indicated that it had smelled an odor of narcotics coming from inside the vehicle, probable cause existed to search the car. The dog's positive alert, together with the facts that the defendant was nervous; was in possession of a "wad of cash" despite being unemployed; said he had been shopping but had no shopping bags in the passenger compartment; and had no information about the "Fish and Wildlife" registration plate on the car, provided probable cause for the search. See *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 324 (2001) ("Once the dog indicated the presence of narcotics in the rear of the car, [together with other facts,] the police had probable cause to search the car"). Therefore, the search of the defendant's auto-

---

[3]Although the discussion in the *Feyenord* case, see *Commonwealth* v. *Feyenord*, 445 Mass. 72, 82-83 (2005), cert. denied, 545 U.S. 1187 (2006), regarding the lack of expectation of privacy in an odor of narcotics emanating from the car is instructive, the present case is distinguishable. In *Feyenord*, the court concluded that, after a motor vehicle stop, detention of the defendant for a brief period in order to bring a drug-sniffing dog to the scene was permissible in light of reasonable suspicion of criminal activity. *Id.* In the instant case, the police did not immobilize the car, and thus the considerations underlying the *Feyenord* decision are not present.

mobile and the subsequent seizure of the cocaine and heroin were lawful.

The order allowing the motion to suppress is reversed and the matter is remanded to the Superior Court.

*So ordered.*

IRELAND, J. (dissenting, with whom MARSHALL, C.J., and BOTSFORD, J., join). I write separately because I conclude that, in the specific circumstances here, the defendant was seized by the police officer, rendering his consent to the dog sniff invalid, and because I disagree with the court's interpretation of the holding in *Commonwealth* v. *Feyenord*, 445 Mass. 72 (2005), cert. denied, 546 U.S. 1187 (2006).

In carrying out the community caretaking function, a police officer may, among other things, check on a stopped motor vehicle in the breakdown lane of a highway. See *Commonwealth* v. *Evans*, 436 Mass. 369, 372-373 (2002). An investigatory check by a police officer on the status of a vehicle and its occupants falls within the scope of the community caretaking function when its purpose is to protect the well-being of the vehicle's occupants and the public — and not when the purpose is the detection or investigation of possible criminal activity. See *Cady* v. *Dombrowski*, 413 U.S. 433, 441 (1973); *Commonwealth* v. *Knowles*, 451 Mass. 91, 95 (2008); *Commonwealth* v. *Murdough*, 428 Mass. 760, 764 (1999) (inquiry into condition of driver of vehicle stopped at highway rest area, for purpose of determining whether driver posed extreme danger to self or others, came within scope of community caretaking function). "The very limited and focused inspection of a vehicle to determine whether assistance or aid is required is a minimal intrusion on the occupant's, or owner's, expectation of privacy." *Commonwealth* v. *King*, 389 Mass. 233, 242 (1983). An officer also may request to check a motorist's license and registration. See *Commonwealth* v. *Evans*, *supra* at 376. Such a request poses a minimal intrusion on the motorist's rights and does not effect a seizure. *Id.*

A noncoercive inquiry that is initiated for a community caretaking purpose may, however, ripen into a seizure within the meaning of the Fourth Amendment to the United States Consti-

tution and art. 14 of the Massachusetts Declaration of Rights —
therefore requiring constitutional justification. "A person is
seized by the police only when, in light of all the attending cir-
cumstances, a reasonable person in that situation would not feel
free to leave." *Commonwealth* v. *DePeiza*, 449 Mass. 367, 369
(2007), citing *Commonwealth* v. *Stoute*, 422 Mass. 782, 786
(1996). In *Commonwealth* v. *Eckert*, 431 Mass. 591, 595-596
(2000), where an officer approached a vehicle parked at a high-
way rest area to check on the well-being of a motorist, this court
concluded that the community caretaking encounter ripened into
seizure when, after the motorist responded affirmatively to the
officer's inquiry as to his well-being, the officer further inquired
of the motorist whether he had been drinking and asked him to
get out of the vehicle to perform field sobriety tests.

The officer here was engaged in community caretaking at the
outset of his interaction with the defendant. However, I agree
with the motion judge that, in the specific circumstances here, the
defendant was seized when the officer asked him whether he
would consent to a canine sniff of the exterior of the vehicle. The
defendant's vehicle, having run out of gasoline, was disabled on
the side of a divided highway with a posted speed limit of fifty-
five miles per hour. Even putting aside consideration of the defend-
ant's interaction with the officer, it would be reasonable for a
motorist in the defendant's situation to conclude that it would be
unsafe to leave his or her vehicle and walk away along the side
of the highway.[1] The circumstances here are distinguishable from
the circumstances present in the cases on which the court relies,
where the defendants were in locations from which they were
able to leave. *Ante* at 843-844 & n.2, citing *Commonwealth* v.
*DePeiza*, 449 Mass. 367, 369-371 (2007); *Commonwealth* v.
*Rock*, 429 Mass. 609, 610-612 (1999); *Commonwealth* v. *Thomas*,
429 Mass. 403, 406 (1999); *Commonwealth* v. *Stoute*, 422 Mass.
782, 785-789 (1996); *Commonwealth* v. *Sanchez*, 403 Mass. 640,
644-645 (1988); *Commonwealth* v. *Gunther G.*, 45 Mass. App.
Ct. 116, 117 (1998).

Furthermore, here the officer had already questioned the defend-

---

[1]It is also possible the defendant could not lawfully walk along the highway.
See 720 Code Mass. Regs. § 9.08(2)(c) (1996) ("No person shall use any
highway for pedestrian or foot traffic purposes except in emergency . . .").

ant for twenty to thirty minutes, and in so doing had checked the defendant's license and registration; the officer had also inquired as to the contents of the defendant's pockets. Because of this persistent and confining series of inquiries, coupled with the fact that the defendant was unable to leave, it was reasonable for the defendant to conclude that his cooperation with the officer's investigation was no longer voluntary, and that he was not free to leave or refuse the dog's investigation when the officer sought the defendant's consent to the dog sniff. See *Commonwealth* v. *Eckert, supra* at 596.

My conclusion that the defendant was seized when the officer expanded the scope of the inquiry is consistent with this court's decisional law concerning traffic stops, which limits the extent of the inquiry an officer may conduct in either a routine traffic stop, where an officer has observed a traffic violation, see *Commonwealth* v. *Bacon,* 381 Mass. 642, 644 (1980), or an investigatory stop of a vehicle, where an officer's observation of suspicious conduct has provided the basis for reasonable suspicion that a crime has been committed, is being committed, or is about to be committed. See *Commonwealth* v. *Ferrara,* 376 Mass. 502, 504 (1978), quoting *Commonwealth* v. *Almeida,* 373 Mass. 266, 270 (1977). Police inquiry during such traffic stops must end on the production of a valid license and registration, unless the officer has a reasonable belief that protective precautions are required, or a reasonable suspicion that criminal activity is afoot. See *Commonwealth* v. *Feyenord,* 445 Mass. 72, 78 n.5 (2005), cert. denied, 545 U.S. 1187 (2006); *Commonwealth* v. *Torres,* 424 Mass. 153, 158 (1997); *Commonwealth* v. *Loughlin,* 385 Mass. 60, 62 (1982); *Commonwealth* v. *Ferrara, supra* at 505. I disagree with the court's holding today, adopting, apparently, a broad new rule that a police officer who encounters a person in a disabled vehicle may conduct an inquiry which is more expansive in scope than would be permissible where a police officer makes a routine or investigatory traffic stop.[2] The court's decision today, which treats stranded motorists differently from motorists who are stopped

[2]In contrast to a community caretaking check into the well-being of an occupant of a vehicle that is already stopped, where no seizure is effected in the constitutional sense, it is well settled that the operator and any occupants of a vehicle pulled over by the police during a traffic stop are detained. See *Berkemer* v. *McCarty,* 468 U.S. 420, 436-437 (1984); *Commonwealth* v. *Thin Van*

by the police, implicates some of the same socioeconomic concerns expressed by Justice Greaney in his concurring opinion in *Commonwealth* v. *Feyenord, supra* at 87 (Greaney, J., concurring). "[Less powerful] citizens (and noncitizens), because of their economic standing, will be driving vehicles [that run out of gasoline or break down on the side of the road]." See *id.* A stranded motorist, even one exhibiting nervousness, should not be subjected to a persistent and unlimited line of inquiry by a police officer merely because he or she had the misfortune to run out of gasoline or to break down on the side of a highway. See *id.*

Because I would conclude that, in the circumstances of this case, the defendant was seized, any further inquiry by the officer beyond the request for the defendant's license and registration had to be justified by reasonable suspicion that a crime had been committed, was being committed, or was about to be committed, grounded in specific, articulable facts and the reasonable inferences drawn therefrom in light of the officer's experience. See *Commonwealth* v. *Eckert, supra*; *Commonwealth* v. *Torres, supra*.

I agree with the motion judge that the requisite reasonable suspicion was lacking here. As the judge found, the factors the officer testified to having relied on as the basis for his suspicion, i.e., the defendant's getting out of the vehicle and walking toward the officer[3]; the water bottles in the vehicle; the vehicle's heavily tinted windows and strong odor of air freshener; the apparent contradictions between the defendant's statements that he was unemployed, and yet had been shopping, but no shopping bags were visible in the sedan's passenger compartment[4]; the vehicle's being a late model Acura; and the defendant's having a "wad" of cash, as well as his nervousness and lack of knowledge about the vehicle's special environmental registration plate, were "completely innocuous and do not, even considered as a whole, give rise to a reasonable suspicion of criminal activity." I agree with the motion judge that, rather than detaining the defend-

---

*Cao*, 419 Mass. 383, 390, cert. denied, 512 U.S. 1146 (1995) (well-established rule that stopping of automobile constitutes seizure).

[3] "It is not unnatural for either the driver or the passenger in an automobile (or both) to get out of the vehicle to meet a police officer" who has stopped to render assistance. *Commonwealth* v. *Torres*, 424 Mass. 153, 159 (1997).

[4] Any shopping bags located in the sedan's trunk would not, of course, have been visible in the passenger compartment.

ant on the basis of reasonable suspicion of criminal activity based on specific, articulable facts, the officer "played a good hunch and fished until he caught something." *Commonwealth* v. *Torres, supra* at 161, quoting *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. 468, 472 (1996). Absent a reasonable suspicion to justify detaining the defendant during further inquiry, the officer's seizure of the defendant was improper. See *Commonwealth* v. *Torres, supra* at 158-163.

Consent obtained as the result of the exploitation of a prior illegality that follows closely in time is not considered to be freely given, and is therefore ineffective to justify an otherwise invalid search. *Id.* at 163, citing *Florida* v. *Royer*, 460 U.S. 491, 500 (1983); *Commonwealth* v. *Yehudi Y.*, 56 Mass. App. Ct. 812, 817 (2002). The nexus between a prior illegality and a subsequent search may, however, be attenuated by the passage of time or as a result of intervening circumstances. *Id.*, and cases cited.

Here there was neither passage of time nor any intervening circumstances between the improper detention of the defendant and the canine sniff that gave rise to the search. I agree with the judge that the defendant's consent was no more than acquiescence to a claim of lawful authority. All of the evidence seized after the improper detention of the defendant should be suppressed as the fruit of the poisonous tree. *Commonwealth* v. *Torres, supra.*

Nor do I agree with the court that consent was not required under the holding in *Commonwealth* v. *Feyenord, supra. Ante* at 845. There, the court held that a canine sniff of a properly stopped vehicle was reasonable and did not violate the defendant's Fourth Amendment and art. 14 rights where, during a lawful traffic stop in which the defendant (among other things) did not produce a valid license, the officer had a basis for reasonable suspicion of further criminal activity. See *Commonwealth* v. *Feyenord, supra* at 76-83. The officer in that case, facing a swiftly evolving set of circumstances, where the visibly nervous driver and his companion gave inconsistent responses about their identities and destination, had a reasonable basis for his growing suspicion that the vehicle contained contraband, and was therefore justified in continuing to detain the defendant, expanding the scope of his investigation by summoning a nearby drug-detection canine unit.

Here, the officer faced no swiftly developing situation that caused his suspicion to escalate, and he had no basis for a reasonable suspicion to justify continuing the inquiry. See *Commonwealth* v. *Feyenord, supra* at 81, citing *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 323 (2001). Because the officer lacked reasonable suspicion, I conclude that the officer's conduct in expanding the scope of the inquiry was not proportional. Contrast *Commonwealth* v. *Sinforoso, supra.*

Moreover, the court expressly distinguished its decision in the *Feyenord* case from the type of circumstances present here, where the driver of a vehicle produced a valid license and registration during an uneventful threshold inquiry, giving rise to no further suspicion of criminal activity. *Commonwealth* v. *Feyenord, supra* at 78 n.5. The court also left open the question whether, under art. 14, the police may initiate a canine sniff of a vehicle stopped for a traffic violation, in the absence of any suspicion of criminal activity beyond the violation. *Id.* at 79 n.7. The court's decision today does not explain its rationale for expanding the *Feyenord* holding. Indeed, given the court's conclusion that the defendant was not seized, no discussion of the *Feyenord* case should be necessary here. Instead, it appears the court could have concluded that the Commonwealth met its burden to show that the "consent [was] unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976).

"Citizens do not expect that police officers handling a routine traffic violation [or a community caretaking inquiry] will engage, in the absence of justification, in stalling tactics, obfuscation, strained conversation, or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop [or inquiry] might yield up some evidence of an arrestable crime." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 663 (1999). I share the concerns expressed by Justice Greaney in his concurrence in *Feyenord*, that the use of a police dog during a traffic stop or where, as here, an officer assists a stranded motorist is "viscerally disturbing" and amounts to "more than a de minimis intrusion into the detained individual's privacy interests." *Id.* at 89.

I also agree with Justice Greaney that, "under art. 14, the use of a drug-sniffing dog in connection with a routine traffic stop [must] remain the exception and [not] become the rule." *Id.* at 90.

For these reasons, I respectfully dissent.