864 A.2d 1006

Matthew Thomas FITZGERALD

v.

STATE of Maryland.

No. 8, Sept. Term, 2004.

Court of Appeals of Maryland.

Dec. 10, 2004.

Reconsideration Denied Feb. 3, 2005.

Mark Colvin, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for Petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, Judge.

This case raises the issue of whether a canine sniff of an apartment door is a search under the Fourth Amendment of the United States Constitution. The United States Supreme Court and this Court have held that canine sniffs are non-searches for Fourth Amendment purposes. As the canine sniff doctrine does not depend upon the sniff's location, we shall hold that a sniff of an apartment door from a common area is a permissible non-search under the Fourth Amendment.

## I.

In February 2002, an anonymous source informed Detective Leeza Grim of the Howard County Police Department Criminal Investigation Bureau, Vice and Narcotics Division, that Petitioner Fitzgerald and his girlfriend Allison Mancini lived together in an apartment at 3131 Normandy Woods Drive in Ellicott City, Howard County. The source also stated that Fitzgerald and Mancini drove a white pick-up truck and regularly sold a high quality grade marijuana called "Kind Bud." Grim's subsequent investigation confirmed that the couple lived in the building and that the car was registered to Alicia Joy Mancini, apparently Allison Mancini's relative. Grim also learned that Fitzgerald had a juvenile record of

separate 1998 arrests for distribution of marijuana near a school and for three first degree burglaries.

Based on these events, Grim met with Officer Larry Brian of the Howard County Police Department's K–9 unit on March 19, 2002. Brian then visited Fitzgerald and Mancini's apartment building accompanied by Alex, Brian's certified drug detecting dog. Alex's olfactory acumen previously had precipitated numerous arrests.[1] Brian and Alex entered the building through unlocked glass doors leading to a vestibule with a stairwell and mailboxes. Brian led Alex to scan apartment doors A, B, C, and D. Alex "alerted"[2] at apartment A, indicating the presence of narcotics. Apartment A was Fitzgerald and Mancini's apartment. Sniffs of the other three apartments did not result in alerts. Alex repeated the sniffs with the identical outcome. Finally, on March 20, the anonymous source contacted Grim again and asserted that Fitzgerald and Mancini continued to sell "Kind Bud" marijuana.

The next day, District Court Judge JoAnn Ellinghaus–Jones issued a search and seizure warrant for Fitzgerald and Mancini's apartment based on Grim's affidavit. The warrant was executed on April 2, 2002. Grim seized substantial amounts of marijuana and other evidence of marijuana use and distribution. Fitzgerald and Mancini were arrested and charged with possession of marijuana with intent to distribute and related offenses.

In the Circuit Court for Howard County, Fitzgerald moved to suppress the evidence seized pursuant to the search and seizure warrant. Fitzgerald challenged the canine sniff as a search of his apartment without a warrant. Further, he

---

1. Fitzgerald called Officer Brian to testify at the suppression hearing. The examination focused on the dog's reliability. This issue is not before us, as Fitzgerald does not raise it in this appeal. Fitzgerald conceded this point at oral argument.

2. At the suppression hearing, Officer Brian testified about how Alex communicates his detection of contraband: "Okay. What Alex does is he sits there and I present to him, he sits there in that area, and what he does is he'll sit and he looks at me and that is his indication to me that he smells the presence of a narcotic."

claimed that without the canine sniff, the police would have lacked the requisite probable cause for the warrant.

After hearings on September 18 and October 3, 2002, Judge Lenore Gelfman denied the motion on October 21, 2002. Judge Gelfman held that the apartment hallway was open to the public and that the Supreme Court and this Court have held dog sniffs not to be searches.

This case proceeded before the Circuit Court on a plea of not guilty, agreed statement of facts. The Circuit Court found petitioner guilty of possession with intent to distribute a controlled dangerous substance and sentenced him to two years incarceration, all suspended, and a $1000 fine, all but $250 suspended, with two years supervised probation. The State entered a *nolle prosequi* to the other counts.

Fitzgerald noted a timely appeal of Judge Gelfman's denial of his Motion to Suppress. In a thorough and well-written opinion authored by Judge Charles Moylan, the Court of Special Appeals affirmed. We granted certiorari on April 8, 2004. 380 Md. 617, 846 A.2d 401 (2004). Fitzgerald presents this Court with three questions, which we list in slightly altered form:

I. Does a dog sniff constitute a search under the Fourth Amendment of the United States Constitution or Article 26 of the Maryland Declaration of Rights?

II. If so, was the sniff an unlawful search?

III. If the dog sniff is unlawful and its results excised from Grim's affidavit, would the remaining information establish probable cause to issue the warrant?

## II.

We review first Fitzgerald's contention that a canine sniff of an apartment's exterior is a search under the Fourth Amendment. Fitzgerald argues first that the United States Supreme Court decisions in *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) and *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), created a

distinction between canine sniffs of residences and all other canine sniffs. He also argues that Alex's ability to detect diazepam tablets, available by prescription, as well as prohibited narcotics, expanded the scope of Alex's sniff resulting in it becoming a search.

The State responds that *Karo* and *Kyllo* are inapplicable to dog sniffs and that the Supreme Court and this Court have held a dog sniff not to be a search. The State argues that this Court should not consider the diazepam issue, because Fitzgerald did not raise it below.

 Our review of the propriety of the denial of a motion to suppress is confined to the record of the suppression hearing. *See State v. Carroll*, 383 Md. 438, 859 A.2d 1138, 1142 (2004); *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999). We review the trial court's legal conclusions *de novo* for clear error and the factual findings in the light most favorable to the State. *See Ferris*, 355 Md. at 368, 735 A.2d at 497.

## A.

The United States Supreme Court determined the constitutionality of a warrantless canine sniff in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).[3] In *Place*, an airline passenger raised the suspicions of law enforcement officers before takeoff. The police officers contacted Drug Enforcement Administration agents in the arrival city. As part of their investigation, the agents had a trained narcotic detection dog sniff the passenger's two pieces of luggage. *Id.* at 698–99, 103 S.Ct. at 2639–40 The Supreme Court held that a canine sniff is not a search under the Fourth

---

**3.** On April 5, 2004, the United States Supreme Court granted certiorari in *People v. Caballes*, 207 Ill.2d 504, 280 Ill.Dec. 277, 802 N.E.2d 202 (2003), in order to determine whether the Fourth Amendment requires reasonable, suspicion "to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." *Illinois v. Caballes*, —— U.S. ——, 124 S.Ct. 1875, 158 L.Ed.2d 466 (2004).

Amendment.[4] *Id.* at 707, 103 S.Ct. at 2645. The Court noted the limited nature of a canine sniff:

> "A 'canine sniff' by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

> "In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment."

*Id.* at 707, 103 S.Ct. at 2644–45. From the above language alone, it is possible to view the Court's holding either as narrowly directed at airplane luggage or as a general categorization of canine sniffs as non-searches. Subsequent Supreme Court decisions make clear that the Court has adopted the latter view.[5]

---

**4.** The Court ultimately held that the agents' ninety-minute detention of the luggage was an unreasonable seizure. *United States v. Place,* 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983).

**5.** The vast majority of state courts considering dog sniffs have recognized that a canine sniff is not a Fourth Amendment search. *See, e.g.,*

In *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Supreme Court affirmed the Court's *Place* dog sniff holding. After concluding that federal agents' seizure of a white powdery substance discovered by private freight carrier employees was not unreasonable, the Court held that a chemical test to determine whether the powder

Arizona, *State v. Box,* 205 Ariz. 492, 73 P.3d 623, 627–28 (Ct.App.2003); *State v. Weinstein,* 190 Ariz. 306, 947 P.2d 880, 884 (Ct.App.1997); Arkansas, *Sims v. State,* 2004 WL 652418 (Ark.2004); *Miller v. State,* 81 Ark.App. 401, 102 S.W.3d 896, 902 (2003); *Willoughby v. State,* 76 Ark.App. 329, 65 S.W.3d 453, 456 (2002); *Vega v. State,* 56 Ark.App. 145, 939 S.W.2d 322, 323 (1997); California, *People v. Bautista,* 115 Cal.App.4th 229, 8 Cal.Rptr.3d 862, 867 (2004); Colorado, *People v. Ortega,* 34 P.3d 986, 991 (Col.2001) (en banc); Florida, *Bain v. State,* 839 So.2d 739, 741 (Fla.Dist.Ct.App.2003); *Cardwell v. State,* 482 So.2d 512, 515 (Fla.Dist.Ct.App.1986); Georgia, *Cole v. State,* 254 Ga.App. 424, 562 S.E.2d 720, 722 (2002); Idaho, *State v. Parkinson,* 135 Idaho 357, 17 P.3d 301, 307 (Ct.App.2000); *State v. Martinez,* 129 Idaho 426, 925 P.2d 1125, 1130–31 (Ct.App.1996); Illinois, *People v. Cox,* 318 Ill.App.3d 161, 251 Ill.Dec. 133, 739 N.E.2d 1066, 1070 (2000); Indiana, *Bradshaw v. State,* 759 N.E.2d 271, 273 (Ind.Ct.App.2001); Iowa, *State v. Bergmann,* 633 N.W.2d 328, 334 (Iowa 2001); Kansas, *State v. Barker,* 252 Kan. 949, 850 P.2d 885, 891–92 (1993); Louisiana, *State v. Kalie,* 699 So.2d 879, 881 (La.1997); *State v. Washington,* 687 So.2d 575, 580 (La.Ct.App.1997); Massachusetts, *Commonwealth v. Feyenord,* 62 Mass.App.Ct. 200, 815 N.E.2d 628, 633 (2004); Mississippi, *Millsap v. State,* 767 So.2d 286, 292 (Miss.Ct.App.2000); Missouri, *State v. LaFlamme,* 869 S.W.2d 183, 188 n. 2 (Mo.Ct.App.1993); Nevada, *Gama v. State,* 112 Nev. 833, 920 P.2d 1010, 1013 (1996); New Mexico, *State v. Cleave,* 131 N.M. 82, 33 P.3d 633, 636 (2001); New York, *People v. Offen,* 78 N.Y.2d 1089, 578 N.Y.S.2d 121, 585 N.E.2d 370, 371–72 (1991) (mem.); *People v. Dunn,* 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1056–57 (1990); North Carolina, *State v. Fisher,* 141 N.C.App. 448, 539 S.E.2d 677, 683 (2000); North Dakota, *State v. Kesler,* 396 N.W.2d 729, 734–35 (N.D.1986); Ohio, *State v. Brassfield,* 2004 WL 1068781 (Ohio Ct.App.2004); Oklahoma, *Scott v. State,* 927 P.2d 1066, 1068 (Okla.Crim.App.1996); Oregon, *State v. Smith,* 327 Or. 366, 963 P.2d 642, 647 (1998); Pennsylvania, *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74, 78 (1987); Tennessee, *State v. England,* 19 S.W.3d 762, 766–67 (Tenn.2000); Texas, *Rodriguez v. State,* 106 S.W.3d 224, 228–29 (Tex.App.2003); *Porter v. State,* 93 S.W.3d 342, 346–47 (Tex.App.2002); Wisconsin, *State v. Miller,* 256 Wis.2d 80, 647 N.W.2d 348, 351–52 (Ct.App.2002); Wyoming, *Morgan v. State,* 95 P.3d 802, 807–08 (Wyo.2004); *but see State v. Ortiz,* 257 Neb. 784, 600 N.W.2d 805, 815–17 (1999). Of the remaining states considering the issue, most have held based on their state constitutions that a dog sniff is a search requiring reasonable suspicion. *See* cases listed in *infra* n. 14, at 511.

was cocaine was not a search. *Id.* at 121–23, 104 S.Ct. at 1661–62. The *Jacobsen* Court asserted that its holding "is dictated by *United States v. Place.*" *Id.* at 123, 104 S.Ct. at 1662. Indeed, the *Jacobsen* Court relied on the same reasoning as *Place.* The Court based its decision on the test's narrow scope of determining whether or not the powder was cocaine; "It could tell him nothing more, not even whether the substance was sugar or talcum powder." *Id.* at 122, 104 S.Ct. at 1661. Because of its limited scope, the test "does not compromise any legitimate interest in privacy." *Id.* at 123, 104 S.Ct. at 1661.

■ The *Jacobsen* Court held that there is no legitimate privacy interest in the presence of illegal narcotics:

"... [M]erely disclosing that the substance is something other than cocaine—such a result reveals nothing of special interest. Congress has decided ... to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest."

*Id.* at 123, 104 S.Ct. at 1662. Rejecting Jacobsen's attempt to distinguish *Place* based on the dog's position outside of the luggage as opposed to the *Jacobsen* agents' physical invasion of his "effects," the Court stated that "... the *reason* this [*Place's* sniff] did not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items. That rationale is fully applicable here." *Id.* at 124 n. 24, 104 S.Ct. at 1662 n. 24. Thus, *Place* and *Jacobsen* together establish that government tests, such as a canine sniff, that can reveal only the presence or absence of narcotics and are conducted from a location where the government officials are authorized to be, *i.e.* a public place, are not searches.

■ A review of *Place* and *Jacobsen* indicates that a crucial component of the Supreme Court's holdings is the focus on the scope and nature of the sniff or test, rather than on the object sniffed, in determining whether a legitimate privacy interest

exists. This conclusion is supported by *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). While holding unconstitutional a highway checkpoint program designed to discover and interdict illegal narcotics, the Supreme Court noted that the program's use of dogs to sniff the outside of automobiles is constitutional. *Id.* at 40, 121 S.Ct. at 453. The Court wrote,

> "Just as in *Place,* an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics. Like the dog sniff in *Place,* a sniff by a dog that simply walks around a car is 'much less intrusive than a typical search.'"

*Id.* at 40, 121 S.Ct. at 453 (citations omitted).

■ Similarly, the three dissenting justices wrote, "We have already held, however, that a 'sniff test' by a trained narcotics dog is not a 'search' within the meaning of the Fourth Amendment because it does not require physical intrusion of the object being sniffed and it does not expose anything other than the contraband items." *Id.* at 52–53, 121 S.Ct. at 460 (Rehnquist dissenting) (citing *Place*). The focus of the Court and dissent's application of *Place* is not the object sniffed, the exterior of the luggage in *Place* and of the car in *Edmond,* but rather the narrow yes/no scope of the sniff. The only relevant locational determination is whether the dog was permitted *outside* the object sniffed.

We applied the binding precedent of *Place* and its progeny in *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001). We held, based on *Place* and *Jacobsen,* that a canine (K–9) scan of a car is not a search under the Fourth Amendment.[6] *Id.* at 581, 774 A.2d at 436. *See also, State v. Wallace,* 372 Md. 137, 156, 812 A.2d 291, 302 n. 6 (2002) (noting that "a canine sniff, in and of

---

6. *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001), focused primarily on whether the police improperly extended a traffic stop, in order to give the K–9 officer and dog sufficient time to arrive and scan. We held that the police did not extend improperly the stop. *Id.* at 588, 774 A.2d at 440.

itself, is not a search for purpose of the Fourth Amendment");
*Gadson v. State*, 341 Md. 1, 8, 668 A.2d 22, 26 n. 4 (1995)
(noting that a "dog sniff of a vehicle conducted during a lawful
detention is not a 'search' within the meaning of the Fourth
Amendment). After quoting *Place*, we noted:

"We recognize the apparent difference between a K–9 scan
conducted on a vehicle during a traffic stop and a K–9 scan
conducted on luggage at an airport, however, we see no
difference in their relationship to the Fourth Amendment.
A K–9 scan alone constitutes neither an intrusive search in
the traditional sense nor a seizure and thus, there are few
Fourth Amendment implications."

*Wilkes*, 364 Md. at 581, 774 A.2d at 436 n. 20. Thus, we read
*Place* as applicable to dog sniffs in general, independent of the
object searched, because of the sniffs' narrow scope. Again,
the location or circumstance of the sniff was relevant only to
determine whether the dog and officer's presence there was
constitutional.

B.

Despite the Supreme Court and this Court's precedent,
Fitzgerald asserts that dog sniffs of apartment doors are
searches. This is a case of first impression in Maryland in the
sense that we have never discussed the applicability of dog
sniffs to the outside of an apartment. As our interpretation of
*Place* is not object or location dependent, though, this case is
indistinguishable from our case law on car sniffs and from the
Supreme Court's doctrine articulated in *Place*; *Jacobsen*, and
*Edmond*. In addition, *Place* and its progeny have been
applied in dozens of cases to multiple objects or locations
besides luggage and automobiles: to hotel or motel rooms, *see,
e.g., United States v. Roby*, 122 F.3d 1120 (8th Cir.1997);
railroad sleeper compartments, *see United States v. Colyer*,
878 F.2d 469 (D.C.Cir.1989); storage facilities, *see, e.g., United
States v. Vasquez*, 909 F.2d 235 (7th Cir.1990) (garage); *United
States v. Lingenfelter*, 997 F.2d 632 (9th Cir.1993) (ware-
house); packages shipped via common carrier, *see, e.g., United
States v. Daniel*, 982 F.2d 146 (5th Cir.1993); residences

(cases discussed in detail *infra*); and non-contact sniffs of individual persons, *see, e.g., United States v. Reyes,* 349 F.3d 219 (5th Cir.2003). There have been very few cases holding dog sniffs to be a search under the Fourth Amendment. These cases concerned individual persons, *see, e.g., United States v. Kelly,* 302 F.3d 291 (5th Cir.2002),[7] automobiles, *see, e.g., United States v. Winningham,* 140 F.3d 1328 (10th Cir. 1998), and residences (all three cases discussed *infra* ). *See generally,* Brian L. Porto, Annotation, *Use of Trained Dog to Detect Narcotics or Drugs as Unreasonable Search in Violation of Fourth Amendment,* 150 A.L.R. Fed. 399 (2004).

Fitzgerald proposes that we differentiate sniffs of the exterior of homes from all other sniffs. He argues that the "application of the *Place* rationale to an investigative technique that intrudes upon the privacy of the home would be wholly at odds with the principles embodied in the Fourth Amendment." To support his argument, he points to *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) and *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). We will discuss both cases and conclude that they are not relevant to dog sniff doctrine.

In *Karo,* a federal agent learned that Karo and others had ordered 50 gallons of ether from an informant and planned to use the ether to extract cocaine from imported clothing. Pursuant to a court order and the seller's consent, government agents installed a beeper in one can of ether. The agents monitored the beeper through its many travels, including

---

7. The question of dog sniffs of individuals is not before us today and has never been decided by this Court. Since *Place* was decided, only two federal circuit courts have addressed this issue. The Fifth Circuit has held that "an up-close canine sniff involving contact with a person's body is a search as defined in the Fourth Amendment," *United States v. Kelly,* 302 F.3d 291, 293 n. 1 (5th Cir.2002), but that an unintentional sniff of a person by a dog not in close proximity is not a search, *United States v. Reyes,* 349 F.3d 219, 224 (5th Cir.2003). The Ninth Circuit has held that a sniff of a person from a close proximity is a search. *See B.C. v. Plumas Unified School District,* 192 F.3d 1260, 1266 (9th Cir.1999). Consideration of this issue requires a record, extensive briefing, and oral argument. Hence, we take no position on the issue.

sojourns in private residences. The Court held that monitoring a beeper in a private residence constitutes a Fourth Amendment search. *Karo,* 468 U.S. at 714, 104 S.Ct. at 3303.

Fitzgerald is correct that *Karo* emphasized the expectation of privacy in private residences; the Court wrote, "At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." *Id.* The Court, though, based its holding on the scope of information a beeper reveals. Comparing the beeper to the obviously impermissible case of an officer entering a private residence to verify the ether's presence, the Court noted:

"For purposes of the [Fourth] Amendment, the result is the same where, without a warrant, the Government surreptitiously employs an electronic device to obtain information that it could not have obtained by observation from outside the curtilage of the house. The beeper tells the agent that a particular article is actually located at a particular time in the private residence and is in the possession of the person or persons whose residence is being watched. Even if visual surveillance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises."

*Id.* at 715, 104 S.Ct. at 3303. The beeper's broader revelation about the interior of the house is a significant one. In *Karo,* the agents failed to notice that the ether had been moved from one residence to another. Only through using the beeper did they determine that the ether was no longer in the first house and then that the ether was in a second house. *Id.* at 708, 104 S.Ct. at 3300.

*Karo* is inapposite to the case *sub judice* for a number of reasons. First, *Karo's* rationale does not contradict *Place's* rationale; the two complement each other. *Place* held that a dog sniff is unique in that it *only* can determine the presence

or absence of contraband, 462 U.S. at 707, 103 S.Ct. at 2644, while *Karo* held that a beeper's utility is too broad, because it indicates both the arrival of the ether and its continued presence. 468 U.S. at 715, 104 S.Ct. at 3303. Crucial in this respect is *Karo's* emphasis of the difference between what the government can observe *outside* the residence and what the beeper tells the government from its presence *inside* the residence. The dog, Alex in our case, occupied the same position as the government agent; he observed from the public space outside the residence. Were Alex to have entered the residence himself without a warrant, he would have conducted an unconstitutional search.

Second, the object detected in *Karo* was a can of ether. The ether itself was not contraband; it was a potential tool for extracting contraband. In *Place*, the object was contraband itself. A pivotal premise of *Place* was that the sniff "does not expose noncontraband items." *Id.*

Third, the *Karo* Court repeatedly categorized a beeper as an "electronic device." *See, e.g.,* 468 U.S. at 715, 104 S.Ct. at 3303 (referring to the "monitoring of an electronic device such as a beeper ..."). While we recognize that *Karo* did not make clear that the beeper's status as an electronic device guided the Court's decision, *Karo* read with *Kyllo, infra,* formulates a doctrine governing the use of technology to learn the contents of residences. Indeed, the *Karo* Court did make reference to the "technological advances" the *Kyllo* Court considered so important; in holding that the transfer to Karo of the can with the beeper was not itself a search, the *Karo* Court noted, "It is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence." *Karo,* 468 U.S. at 712, 104 S.Ct. at 3302.

Fitzgerald next cites *Kyllo* for his argument that *Place* and its progeny should not apply to the exterior of residences. In *Kyllo,* the Supreme Court held that the police's use of a thermal imager outside a residence to detect the amount of heat inside constituted a search, even if the purpose was to determine the presence of marijuana inside. 533 U.S. at 40,

121 S.Ct. at 2046. The Court elaborated a "general public use" standard: "We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' constitutes a search—at least where (as here) the technology in question is not in general public use." *Id.* at 34, 121 S.Ct. at 2043 (citation omitted). Fitzgerald argues that this standard includes dog sniffs, which he classifies as "sense-enhancing technology" that is "not in general public use."

Even a perfunctory reading of *Kyllo* reveals that its standard does not apply to dog sniffs. *Kyllo* is an opinion about the need to limit "advancing technology." *See, e.g., id.* at 33–34, 121 S.Ct. at 2043 (commenting that "It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology."); *id.* at 34, 121 S.Ct. at 2043 (stating that "The question we confront today is what limits there are upon this power of technology to shrink the realm of guaranteed privacy."). The *Kyllo* Court sought to draw a line to prevent the police from utilizing continuously advancing technologies to "see" more and more inside the home. For example, the Court asserted,

> "Reversing that approach [of a non-rigid application of the Fourth Amendment] would leave the homeowner at the mercy of advancing technology—including imaging technology that could discern all human activity in the home. While the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development."

*Id.* at 35–36, 121 S.Ct. at 2044. The Court viewed the thermal imager as particularly nefarious, even in its crude form, because of its broad potential uses. The imager's utility was not limited to ascertaining whether contraband was present. Instead, the imager could reveal "intimate" details such as "at what hour each night the lady of the house takes her daily sauna and bath." *Id.* at 38, 121 S.Ct. at 2045.

With this review of *Kyllo*, it is clear that *Kyllo* has no bearing on dog sniffs. First, a dog is not technology—he or she is a dog. A dog is known commonly as "man's best friend." Across America, people consider dogs as members of their family. The same cannot be said of cars, blenders, or thermal imagers.[8] In criticizing the general public use standard, the *Kyllo* dissenters argued that "sense-enhancing technology" is too broad. They did not argue that it would include dog sniffs, but rather that it would "embrace potential mechanical substitutes for dogs trained to react when they sniff narcotics." *Id.* at 47, 121 S.Ct. at 2050. (Stevens dissenting).[9] Recognition that *Kyllo* does not apply to dog sniffs is also clear from context. In *Edmond,* the majority opinion and Chief Justice Rehnquist's dissent, together signed by all nine justices, mentioned with little need for discussion that *Place* applied to automobiles as well as luggage. 531 U.S. at 40, 121 S.Ct. at 453; 531 U.S. at 52–53, 121 S.Ct. at 460 (Rehnquist dissenting). *Kyllo* was decided less than seven months after *Edmond.* Were the *Kyllo* standard to apply to dog sniffs, surely the Court would have discussed its well-established *Place* precedent.

---

8. In American Bar Association, ABA Standards for Criminal Justice: Electronic Surveillance § 2–9.6 (3d ed. 1999), the ABA proposed prohibiting use of a "contraband-specific detection device" on residences or individuals. The comment to § 2–9.2 states that "a device which could mimic the behavior of some specially trained dogs by alerting only to the presence of drugs would be 'contraband-specific.' " Thus, even pre-*Kyllo*, the ABA recognized the difference between a drug detecting dog and a "device" or technology.

9. Fitzgerald argues that Alex the dog must be considered technology under *Kyllo*, because *Kyllo* would consider technology an inanimate device performing the same function as Alex. We do not need to determine here whether employing a device performing identical functions *and* with identical limitations to live dogs would constitute a search. Faced with a device similar in narrow scope to a dog, the *Jacobsen* Court held that its use did not constitute a search. Faced with a thermal imager with a broader scope, the *Kyllo* Court held that its use was a search. Either way, Fitzgerald ignores that *Kyllo's* holding and rationale centered on "advancing technology." A dog-mimicking device would be technology that could advance to become far more invasive than a dog's sniff.

Second, dogs are not "advancing technology." Even taking into account potential gains from evolution, breeding, and improved nutrition, the limits to dogs' future ability to smell are not far from the current limits. *See Fitzgerald v. State,* 153 Md.App. 601, 686–87, 837 A.2d 989, 1037–38 (2003) (citing Homer's *The Odyssey,* a twelfth century declaration of King Richard I of England, Sherlock Holmes, and bloodhounds chasing fugitives as evidence that the investigative use of dogs' sense of smell "is, *a fortiori,* not an unfamiliar or rapidly advancing technology"). Not so with technology. Technology is constantly advancing; few who have witnessed the computer revolution doubt that technology can advance in the future beyond our wildest dreams today.

Finally, *Kyllo's* concern with thermal imagers' scope and potential revelation of intimate private details fits neatly with *Place's* rationale that dog sniffs are unique in their narrow yes/no determination of the presence of narcotic. A person does not have a legitimate expectation of privacy in contraband, but does in bath water. A dog that can determine contraband's existence and nothing else is not a search, even when sniffing the exterior of a home.

From the above we conclude that *Kyllo's* appropriate attempt to limit technology's steady advance into the home does not compel a reversal of precedent on dog sniffs. The cases Fitzgerald refers us to do not convince us otherwise. Fitzgerald relies primarily on three cases holding that dog sniffs of residences' exteriors are searches: *United States v. Thomas,* 757 F.2d 1359 (2nd Cir.1985), *State v. Ortiz,* 257 Neb. 784, 600 N.W.2d 805 (1999), and *State v. Rabb,* 881 So.2d 587 (Fl.Dist. Ct.App.2004). We are not persuaded by *Ortiz,* because the Nebraska Supreme Court's analysis only perfunctorily discussed *Place* and focused mainly on state courts' holdings based on their state constitutions. *See Ortiz,* 257 Neb. at 815–17, 600 N.W.2d 805. *Thomas* has been criticized by other federal circuits and appears never to have been followed by any federal courts outside of the Second Circuit. *United States v. Hogan,* 122 F.Supp.2d 358, 369 (E.D.N.Y.2000).

 *Thomas* held that a canine sniff of an apartment is a search, distinguishing *Place* based on the heightened expectation of privacy in homes. 757 F.2d at 1366–67. We reject *Thomas's* distinction as contrary to the Supreme Court's precedent. As discussed above, *Place; Jacobsen,* and *Edmond* rely upon the nature of a dog sniff. The Supreme Court precedent and lower courts' case law, including our own, make clear that the status of a dog sniff does not depend on the object sniffed. For this reason, a number of other courts have criticized *Thomas* as inconsistent with *Place* and its progeny. *See United States v. Reed,* 141 F.3d 644, 650 (6th Cir.1998) (explaining that "this [*Thomas's*] holding ignores the Supreme Court's determination in *Place* that a person has no legitimate privacy interest in the possession of contraband, thus rendering the location of the contraband irrelevant to the Court's holding that a canine sniff does not constitute a search."); *Lingenfelter,* 997 F.2d at 638 (stating that "*Thomas* has been rightfully criticized."); *Colyer,* 878 F.2d at 475 (rejecting *Thomas* because "... the Supreme Court's analyses in *Place* and *Jacobsen* indicate that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed."); *People v. Dunn,* 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1057 (1990) (noting that "The distinction it [*Thomas* ] relies upon, namely, the heightened expectation of privacy that a person has in his residence, is irrelevant under *Place's* rationale."); [10] *Nelson v. State,* 867 So.2d 534, 536 (Fla.Dist.Ct.App.2004) (noting that "the *Thomas* decision has been criticized by all federal courts that have considered it").

 Next, Fitzgerald points to *Rabb,* in which the Florida District Court of Appeal, Fourth District, held that a sniff of a residence's door is a search. We are not persuaded by this

---

**10.** As discussed *infra,* the *Dunn* court held that the New York state constitution required a reasonable suspicion standard, but that reasonable suspicion existed to support the search. The *Dunn* court noted, "Although, as noted earlier, we find the *Thomas* court's holding to be wrong as a matter of Federal constitutional law, we nevertheless find much of its analysis to be persuasive in interpreting our State Constitution." *Dunn,* 563 N.Y.S.2d 388, 564 N.E.2d at 1058 n. 4.

opinion, as the court based its conclusion on *Thomas* and a mistaken reading of *Kyllo*. 881 So.2d at 591–93. In his dissent, Judge Gross critiqued the majority's analysis, citing extensively from the Court of Special Appeals's decision below. *Id.* at 601–04. Fitzgerald does not cite and we could not find any other case holding that a sniff of the outside of a residence is a search under the Fourth Amendment.

Other courts considering the issue under the Fourth Amendment have concluded that a sniff of the exterior of a residence is not a search. In *Dunn*, the police received information that Dunn stored narcotics in his apartment. The police brought a trained dog to sniff the door from the common hallway. The dog alerted, the police obtained a search warrant, and the police found narcotics and other paraphernalia. *Dunn*, 563 N.Y.S.2d 388, 564 N.E.2d at 1055. The court rejected *Thomas* explicitly and held that *Place* and *Jacobsen's* rationales dictated that canine sniffs of residences are not searches under the Fourth Amendment. *Id.* at 1056–57. *See also Reed*, 141 F.3d at 650 (holding that a canine sniff of the inside of an apartment was not a search when the canine team was lawfully present in the building); *United States v. Tarazon–Silva*, 960 F.Supp. 1152, 1162 (W.D.Tex. 1997) (mem.) (holding that a dog's sniffing of the outside of a residence and alerting to a dryer vent was not a search when the dog and police officer had a "right" to be positioned alongside the residences); *Rodriguez v. State*, 106 S.W.3d 224, 228–29 (Tex.App.2003) (holding based on *Place; Jacobsen*, and *Porter, infra*, that a dog sniff of the outside of a residence is not a search); *Porter v. State*, 93 S.W.3d 342, 346–47 (Tex. App.2002) (holding that a dog sniff of a residence's front door is not a search under *Jacobsen's* rationale and rejecting *Kyllo's* applicability).

■■ In sum, we conclude that binding and persuasive authority compel our holding that a dog sniff of the exterior of a residence is not a search under the Fourth Amendment. To be sure, the dog and police must lawfully be present at the site of the sniff. *Reed*, 141 F.3d at 649; *see also Place*, 462 U.S. at

709, 103 S.Ct. at 2645 (noting that the sniffed luggage was "located in a public place"). In the present case, Brian and Alex lawfully were present, as the apartment building's common area and hallways were accessible to the public through an entrance of unlocked glass doors. *See, Eisenstein v. State,* 200 Md. 593, 600, 92 A.2d 739, 742–43 (1952) (holding that an apartment building's vestibule that was unlocked and used as a public entrance was a "public hallway" open to police); *Roby,* 122 F.3d at 1125 (holding that a sniff is permissible from a hotel's common corridor).

## C.

■ Next, we consider Fitzgerald's argument that Alex's sniff was a search because Alex was trained to alert to diazepam tablets, *i.e.* Valium. The State asserts that Fitzgerald did not raise the diazepam detection issue in either the Circuit Court or the Court of Special Appeals. Consequently, under Maryland Rules of Procedure 8–131(a) and (b), the Court should not review this issue. In support, the State notes that there is nothing in the record indicating whether a dog could detect diazepam tablets from outside the apartment.

■ We agree with the State that this issue was not raised below. A review of the record indicates that the significance of Alex's ability to detect diazepam tablets was not raised during the Motion to Suppress. Neither party mentioned diazepam in their briefs before the Court of Special Appeals, besides a footnote listing the substances Alex can detect. Further, we agree with the State that the Maryland Rules of Procedure and precedent support the conclusion that the issue is not properly before this Court. Maryland Rule 8–131(a) states in relevant part,

"Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

It is well-established and this Court has held consistently that we, in accordance with Rule 8–131, ordinarily will not consider any point or question not plainly raised or decided by the trial court. *See Taylor v. State*, 381 Md. 602, 612, 851 A.2d 551, 557 (2004) (citing Md. Rule 8–131(a) in holding that a claim of double jeopardy was not preserved because it was not raised at the trial level); *Conyers v. State*, 354 Md. 132, 148, 729 A.2d 910, 918 (1999) (citing Md. Rule 8–131(a) in holding that several issues in review of a death sentence were not preserved because they were not raised at the trial level); *Lerman v. Heeman*, 347 Md. 439, 450, 701 A.2d 426, 432 (1997) (citing Md. Rule 8–131(b)(1) in holding that an indemnity and contribution issue was not preserved because it was not raised before the trial court or Court of Special Appeals); *County Council v. Offen*, 334 Md. 499, 508, 639 A.2d 1070, 1074 (1994) (citing Md. Rule 8–131(b)(1) in determining that specific zoning issues were not before the Court and citing Md. Rule 8–131(a) to hold that the Court of Special Appeals should not have raised on its own the issue of zoning estoppel). The primary purposes of the rule are:

> " '(a) to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, and (b) to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation.' "

*Offen*, 334 Md. at 509, 639 A.2d at 1075 (quoting *Clayman v. Prince George's County*, 266 Md. 409, 416, 292 A.2d 689, 693 (1972)). "A court should not, for example, exercise its discretion to consider an issue raised for the first time on appeal if to do so would unfairly prejudice the parties." *Id.* at 509–10, 639 A.2d at 1075.

The diazepam issue does not plainly appear by the record to have been raised in or decided by the trial court. Permitting Fitzgerald to raise this issue for the first time in this Court would undermine the purposes behind Rule 8–131. It also would prejudice unfairly the State, because the State did not have the opportunity to present evidence on this complex

issue. Accordingly, we decline to determine whether Alex's ability to detect diazepam tablets renders his sniff a search under the Fourth Amendment.

## III.

Fitzgerald argues that even if Alex's sniff is not a search under the Fourth Amendment, it is a search under Article 26 of the Maryland Declaration of Rights.[11]

Fitzgerald acknowledges our precedent holding that Article 26 of the Maryland Declaration of Rights is to be interpreted *in pari materia* with the Fourth Amendment. *See Gahan v. State,* 290 Md. 310, 319, 430 A.2d 49, 54 (1981) (stating that "This Court has said many times that Art. 26 is in pari materia with the Fourth Amendment."). He points out, though, that our cases have held that a violation of the state provision might not be a violation of the federal provision, and vice versa. Specifically, he cites *Gahan*:

"Of course, as Judge Digges said for the Court recently in a slightly different context in *Attorney General v. Waldron,* 289 Md. 683, 714, 426 A.2d 929 (1981), although a clause of the United States Constitution and one in our own Declaration of Rights may be 'in pari materia,' and thus 'decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other.'"

*Id.* at 322, 430 A.2d at 55; *accord Dua v. Comcast Cable,* 370 Md. 604, 621–22, 805 A.2d 1061, 1071–72 (2002). Fitzgerald argues that his case should be one in which Article 26 holds an action to be a violation (as an illegal search), while the Fourth

---

11. Article 26 provides,

"That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

Amendment permits the action (as a non-search). To support this claim, Fitzgerald argues that Article 26 was designed to protect the sanctity of the home, thus, creating stronger protection than the Fourth Amendment for sniffs outside a residence.

In addition, Fitzgerald encourages us to adopt an exclusionary rule for evidence obtained in violation of Article 26. Fitzgerald acknowledges our precedent declining to recognize an exclusionary rule under our Declaration of Rights. *See Chu v. Anne Arundel County,* 311 Md. 673, 537 A.2d 250 (1988). Fitzgerald, though, makes a number of arguments in support of the Court recognizing an exclusionary rule.

First, Fitzgerald posits that we have not considered whether an exclusionary rule applies to police conduct which violated Article 26 but not the Fourth Amendment, since the Supreme Court decided *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).[12]

Second, Fitzgerald argues that an exclusionary rule is necessary to deter police misconduct and to ensure enforcement of the Fourth Amendment. This policy reasoning derives from *Mapp* itself:

"To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment. Only last year the Court itself recognized that the purpose of the exclusionary rule 'is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' "

*Id.* at 656, 81 S.Ct. at 1692 (quoting *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)).

Third, and perhaps most persuasive, Fitzgerald notes a trend approaching unanimity among the states to recognize exclusionary rules. According to Fitzgerald, in 1914, only one state had adopted an exclusionary rule. The number in-

---

**12.** *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) was the groundbreaking decision applying the Fourth Amendment's exclusionary rule to state cases.

creased to half the states by 1960. Now, fourty-six states have an exclusionary rule for their state constitutions. Fitzgerald points out that two of the remaining states, Florida and California, had exclusionary rules until their constitutions were amended in 1982 to abrogate their exclusionary rules. *Bernie v. State*, 524 So.2d 988, 990–91 (Fla.1988); *People v. Lance W.*, 37 Cal.3d 873, 210 Cal.Rptr. 631, 694 P.2d 744, 752 (1985) (en banc). Maine has not decided the issue. *State v. Veglia*, 620 A.2d 276, 278 n. 3 (Me.1993). Thus, Fitzgerald argues that Maryland stands alone in not recognizing an exclusionary rule under our state constitution. Fitzgerald concludes by quoting Professor LaFave's description and explanation of the near unanimous state approach:

"When (as is occurring with greater frequency) a state court finds that a certain arrest or search passes muster under the Fourth Amendment but that it violates the comparable provision of the state constitution, there does not appear to be any dissent from the conclusion that the fruits thereof must be suppressed from evidence. The rationale for such a result is seldom stated in the cases, but exclusion in these circumstances may be explained on the ground that a violation of the fundamental law of the state constitutes such a substantial intrusion upon the defendant's rights that the exclusionary remedy is just as appropriate as when the Fourth Amendment is violated. That state courts do not even pause to consider the matter in these circumstances is perhaps not too surprising, for in those relatively uncommon situations in which a court interprets the state equivalent of the Fourth Amendment to forbid some practice the Supreme Court has not deemed a violation of the Fourth, it is clear the court views the practice as constituting a very serious intrusion."

1 Wayne R. LaFave, *Search and Seizure* § 1.5(b) (3d ed. 1996).

The State presents a much simpler argument. Much as Fitzgerald recognized, the State notes our construal of Article 26 as *in pari materia* with the Fourth Amendment and the current absence of an exclusionary rule under our state's

constitution. The State then concludes that the dog sniff was not a search under Article 26, and even it were, that our constitution does not provide the means to exclude the sniff.

■ We will address neither of the parties' positions. There is no need to determine whether this is a case in which Article 26 mandates our finding an illegal search, while the Fourth Amendment mandates a conclusion that no search occurred. Similarly, this is not the case to revisit whether Article 26 contains an exclusionary rule, because even were we to adopt Fitzgerald's position, we would uphold the sniff's validity. As we will discuss *infra*, the majority of state courts holding a dog sniff to be a search under their constitutions apply a reasonable suspicion standard. There was reasonable suspicion to support a sniff of Fitzgerald's apartment door.

We begin with background on the states' reasonable suspicion standard. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court held that a police officer suspecting criminal activity could conduct a minimally intrusive search for weapons if the officer had a reasonable suspicion that the person was armed and dangerous. *Id.* at 21–22, 88 S.Ct. at 1880. In *Place*, Justice Blackmun concurred in the judgment and argued that the Court should not have decided the dog sniff issue. Noting the *Terry* standard, he argued that there were alternative approaches the majority could have taken on dog sniffs. He wrote, "While the Court has adopted one plausible analysis of the issue, there are others. For example, a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under *Terry* upon mere reasonable suspicion." *Place*, 462 U.S. at 723, 103 S.Ct. at 2653.

Professor LaFave explains the advantage of Justice Blackmun's approach. He notes that narcotics detecting dogs are more likely to alert erroneously when used to sniff "wholesale," such as when a dog sniffs a large group of students in a school.[13] LaFave, *supra*, § 2.2(f). Justice Blackmun's reason-

---

**13.** As we noted *supra* in note 1, Fitzgerald has not raised the issue of reliability in this Court.

able suspicion approach would reduce the likelihood of errors; "That is, if the dogs could not be used wholesale fashion but only against persons and effects for which there already existed an independent reasonable suspicion of drug possession, then the opportunity for such erroneous alerts would be substantially reduced." *Id.*

The New York Court of Appeals adopted this approach in *People v. Dunn*, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1057–58 (1990). After determining, based on *Place*, that a dog sniff of a residence was not a search under the Fourth Amendment, the court considered whether it should adopt *Place's* rationale in interpreting the New York Constitution. *Id.* at 1057. The *Dunn* court rejected the relevancy of whether a dog sniff can disclose only evidence of criminality. The court reasoned as follows:

"Unlike the Supreme Court, we believe that the fact that a given investigative procedure can disclose only evidence of criminality should have little bearing on whether it constitutes a search. Notwithstanding such a method's discriminate and nonintrusive nature, it remains a way of detecting the contents of a private place."

*Id.* Instead, the *Dunn* court concluded that it must look to whether the police intruded upon the defendant's reasonable expectation of privacy. *Id.* at 1058. The court held that a sniff of an apartment door did constitute such an intrusion, and, therefore, was a search; "By resorting to this investigative technique, the police were able to obtain information regarding the contents of a place that has traditionally been accorded a heightened expectation of privacy." *Id.* Next, the court held that the validity of a dog sniff should be determined under a reasonable suspicion standard: "Given the uniquely discriminate and nonintrusive nature of such an investigative device, as well as its significant utility to law enforcement authorities, we conclude that it may be used without a warrant or probable cause, provided that the police have a reasonable suspicion that a residence contains illicit contraband." *Id.* at 1058. The court then upheld the sniff, holding that the police had reasonable suspicion. *Id.* at 1059.

Of the states finding a dog sniff to be a search under their state constitutions, almost all have followed a similar approach to *Dunn*, applying a reasonable suspicion standard.[14] In at least two of these cases the state courts refrained from deciding the state constitutional issue, because even if sniffs

**14.** This approach has been adopted in Alaska, *McGahan v. State*, 807 P.2d 506, 509–11 (Alaska Ct.App.1991) (applying *Pooley, infra*, to a sniff of a warehouse's exterior); *Pooley v. State*, 705 P.2d 1293, 1310–11 (Alaska Ct.App.1985) (holding that even if the Alaska constitution is more protective that the Fourth Amendment, the sniff of luggage was still valid under the reasonable suspicion standard); Colorado, *People v. Haley*, 41 P.3d 666, 672 (Col.2001) (en banc) (holding that dog sniffs are searches requiring reasonable suspicion under the Colorado constitution); *People v. Boylan*, 854 P.2d 807, 810–11 (Col.1993) (en banc) (holding according to *Unruh infra*); *People v. Unruh*, 713 P.2d 370, 379 (Col.1986) (holding under the Colorado constitution that while a dog sniff is a search, it is permissible if reasonable suspicion exists); Connecticut, *State v. Torres*, 230 Conn. 372, 645 A.2d 529, 533–34 (1994) (declining to determine whether a dog sniff is a search under the Connecticut constitution, because even if it were, it would require reasonable suspicion which was present); Illinois, *Cox*, 251 Ill.Dec. 133, 739 N.E.2d at 1073 (holding under the Illinois constitution that a dog sniff is a search requiring reasonable); Minnesota, *State v. Wiegand*, 645 N.W.2d 125, 132–35 (Minn.2002) (holding under the Fourth Amendment and the Minnesota constitution that a sniff is not a search but requires reasonable suspicion); Montana, *State v. Tackitt*, 315 Mont. 59, 67 P.3d 295, 302–03 (2003) (requiring "particularized suspicion" under the Montana constitution); New Hampshire, *State v. Pellicci*, 133 N.H. 523, 580 A.2d 710, 716–17 (1990) (holding that a sniff of a vehicle is a search under the New Hampshire constitution requiring reasonable suspicion); New York, *People v. Offen*, 578 N.Y.S.2d 121, 585 N.E.2d at 371–72 (declining to determine whether the sniff of a package constituted a search under the New York constitution, because even if it did, reasonable suspicion existed); Pennsylvania, *Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185, 1191 (2004) (holding sniffs are searches under the Pennsylvania constitution, and, as long as they are not of persons, require reasonable suspicion); *Johnston*, 530 A.2d at 79 (holding that the Pennsylvania constitution requires reasonable suspicion for the sniff and for the police to be lawfully present); *but see* Washington, *State v. Dearman*, 92 Wash.App. 630, 962 P.2d 850, 853 (1998) (holding that a sniff of a residence is a search requiring a warrant under the Washington constitution). *See generally*, Marjorie A. Shields, Annotation, *Use of Trained Dog to Detect Narcotics or Drugs as Unreasonable Search in Violation of State Constitutions*, 117 A.L.R.5th 407 (2004). Many of these courts based their conclusions on Justice Blackmun's concurring opinion in *Place*, 462 U.S. at 723–24, 103 S.Ct. at 2653, and Professor LaFave's analysis in 1 Wayne R. LaFave, *Search and Seizure* § 2.2(f).

were searches under the state constitution, they would be permissible with reasonable suspicion, and in the instant cases, the police had reasonable suspicion. *See State v. Torres,* 230 Conn. 372, 645 A.2d 529, 533–34 (1994), *People v. Offen,* 78 N.Y.2d 1089, 578 N.Y.S.2d 121, 585 N.E.2d 370, 372 (1991) (mem.).

■■■ The police had reasonable suspicion to conduct a canine sniff of Fitzgerald's door. An anonymous source told Detective Grim Fitzgerald and Mancini's names, their address, and a description of Mancini's truck. The source specified the exact grade of marijuana the source alleged Fitzgerald and Mancini sold on a regular basis. Detective Grim confirmed all the information except the marijuana sales themselves. Further, Detective Grim discovered that Fitzgerald had a juvenile record, including an arrest for distribution of marijuana near a school. These facts confirm that Detective Grim had reasonable suspicion to seek a canine sniff.

Accordingly, we follow the lead of the *Torres* and *Offen* courts and decline to determine whether the Maryland Declaration of Rights deems a dog sniff a search, because even if it did, it would require only reasonable suspicion, which was present in this case.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

GREENE, J., dissents and files opinion in which BELL, C.J., joins.

GREENE, Judge, dissenting, in which BELL, C.J., joins:

The majority holds that a canine sniff, conducted to detect the presence of drugs, of the exterior of an apartment from a common area is not a search within the meaning of the Fourth Amendment. One implication of this holding is that a canine sniff can never constitute a search provided that the handler and the dog are situated in a place they have a right to be. In addition, if the detection of drugs by use of a canine does not constitute a search, then another implication of this holding is

that whenever police utilize this technique, they are free to act without the restraint of probable cause or reasonable suspicion. A far reaching consequence of today's holding is that those who reside in apartment buildings with gated or secured entrances will be afforded greater protections under the law than those who reside in apartment buildings that are left unsecured or open to the public. Moreover, this decision may indeed constitute a logical extension of the rationale of *Place* and *Jacobsen*, resulting, however, in random canine searches in targeted neighborhoods. *See United States v. Roby*, 122 F.3d 1120, 1127 (8th Cir.1997) (Heaney, J., dissenting) ("I do not believe that the Fourth Amendment protects only those persons who can afford to live in a single-family residence with no surrounding common space"). Because of these and other concerns, I respectfully dissent.

The search of a home or person should be given the greatest level of protection:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." The Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Nebraska v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805, 828 (1999) (Connolly, J., concurring). (Internal citations omitted.)

The protection of the home from unreasonable searches and seizures is a core value of the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Thus, I disagree with the majority's conclusion that a canine

sniff is not a search.[1] For example, in *New Hampshire v. Pellicci*, 133 N.H. 523, 580 A.2d 710, 716 (1990), the court stated:

> Employing a trained canine to sniff a person's private vehicle in order to determine whether controlled substances are concealed inside is certainly a search.... The drug detection dog discerned something not otherwise apparent to the officers through their own senses, aided or unaided, and advised them of what the dog had discovered by means the officers could perceive. The very purpose of bringing the dog to the vehicle was to have it detect any contraband that might be hidden inside. The sniff, in short, was a prying by officers into the contents of Pellicci's possessions, which, concealed as they were from public view, could not have been evident to the officers before the prying began.

*See also* 1 William R. LaFave, Search and Seizure, § 2.2(f), at 366 n. 189, 367 n. 202 (2d ed. 1987). The reach of the Fourth Amendment cannot turn upon the presence or the absence of a physical intrusion into any given enclosure. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967) (holding that the government's eavesdropping activities violated petitioners reasonable expectation of privacy and constituted a search within the meaning of the Fourth Amendment).

Here, the canine sniff at the threshold to apartment A, like the canine sniff in *Pellicci*, was a search. The search was conducted on less than probable cause. When police inten-

---

1. In reaching this conclusion, the majority holds that *Karo* and *Kyllo* are irrelevant to the dog sniff doctrine. Specifically, *Kyllo*, the majority asserts, is a discussion about the need to limit the advancing technology and that dog sniffs do not fall into the category of technology. Other courts, however, have concluded that *Kyllo* has diminished the rationale for the proposition that dog sniffs are not searches. *See, e.g., Colorado v. Haley*, 41 P.3d 666, 671 n. 2 (Colo.2001). In other words, the reason the rationale is no longer sound is because the Court in *Kyllo* concluded that the use of a thermal imaging device on a home constituted a search even though it only detected heat radiating from the home. *See Kyllo v. United States*, 533 U.S. 27, 35, 121 S.Ct. 2038, 2043–44, 150 L.Ed.2d 94, 102–103 (2001).

tionally use an investigative technique, in this case a dog, to detect the presence of drugs by directing the dog to a residence or person, that action constitutes a search. I cannot ignore the fact that the police went to that location to detect evidence of criminal activity. In my view, the police should not have brought the dog to the apartment complex without probable cause and a search warrant. For me, the Fourth Amendment draws the line at the entrance to the residence. Absent exigent circumstances, the police may not reasonably cross the threshold without a warrant. The canine sniff at the door of Fitzgerald's apartment was not a detection of something in the hallway, but rather was a detection of something inside Fitzgerald's apartment—a private dwelling. In other words, it was not a search of the hallway—an area of limited expectation of privacy. But rather, it was a search specifically aimed at the contents inside Fitzgerald's apartment—an area of greater expectation of privacy. Thus, it is Fitzgerald's reasonable expectation of privacy in his apartment that is at issue.

The majority focuses on the scope and nature of the "sniff" or "test" rather than the location in determining whether a legitimate privacy interest exits. *See* maj. op. at 494. The majority concludes that the only locational or circumstantial determination relevant to the inquiry is whether the dog was permitted outside the object sniffed. *Id.* I would have no quarrel with this analysis if the scope and nature of the "search" was an object, i.e., an automobile, piece of luggage, or the like used in transit. My disagreement with the majority holding is that a random scanning of residences or people for the detection of contraband will lead to no protections for those who cannot afford to live in residences with no surrounding common space and subject them to selective law enforcement.

History teaches us that a free society cannot remain free if police are permitted to use drug detection dogs or any other crime detection device without restraint. General public opinion, I believe, supports the notion of sanctity of the home. In addition, the United States Supreme Court has recognized a

traditional expectation of privacy within a dwelling place. *United States v. Knotts,* 460 U.S. 276, 282, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55, 62 (1983). Therefore, there should be at least a reasonable restraint on government surveillance, to the extent that even an investigative technique which can discover only contraband is not permissible if conducted at random. The majority today opens the door to wholesale random drug detection by police officers in apartment complexes, motels, offices, shopping centers, parking lots, and other places where people gather, provided the search is conducted from a place the police have a right launch their operation.

The majority here and other federal and state courts have criticized the holding in *United States v. Thomas,* 757 F.2d 1359 (2nd Cir.1985). *Thomas* holds that using a canine sniff to discover narcotics within a particular apartment is a search because it is an intrusion upon a person's "heightened expectation of privacy inside the dwelling." The *Thomas* court explained:

> Although using a dog sniff for narcotics may be discriminating and unoffensive relative to other detection methods, and will disclose only the presence or absence of narcotics, it remains a way of detecting the contents of a private, enclosed space. With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument.

*Thomas,* 757 F.2d at 1367 (internal citation omitted).

Consistent with most courts who challenge the reasoning of *Thomas,* the majority joins the chorus on the grounds that any assertion of heightened expectations runs contrary to the lessons of *Place* and *Jacobsen,* that possession of contraband has no legitimate expectation that its presence will not be revealed. *See United States v. Colyer,* 878 F.2d 469 (D.C.Cir. 1989). It is because of the core protections of the Fourth

Amendment, and the historical context of its development, that I focus upon the heightened expectation of the privacy in the dwelling and in the person. Therefore, I believe the U.S. Constitution mandates probable cause as a basis for that intrusion.

Moreover, the rationale of *Place* assumes that the dog sniff is accurate and that the privacy interests of those involved will not be compromised. Professor La Fave points out that mistakes made by the dog and handler "can—and more than rarely do—result in a false positive identification of drugs." [2] 1 Wayne R. LaFave, Search and Seizure, § 2.2, at 107, n. 140.46, 2004 pocket part (3d ed. 1996). *See* Robert C. Bird, An Examination of the Training and Reliability of the Narcotics Detection Dog, 85 Ky. L.J. 405 (1996). Mistakes can intrude significantly on one's legitimate expectations of privacy. One court has found that the reason dogs may alert falsely is because of the high percentage of cash that contains sufficient quantities of cocaine to trigger a response in a dog. *United States v. Six Hundred Thirty–Nine Thousand Five Hundred and Fifty–Eight Dollars ($639,558) in U.S. Currency,* 955 F.2d 712, 714 n. 2 (D.C.Cir.1992) (pointing out that experts have concluded that anywhere from seventy to ninety-nine percent of all currency in the United States is contaminated by detectable amounts of cocaine).

Second, if the majority is correct and a dog sniff is not a search, then that decision grants the police virtually absolute discretion in who and what they target. Members of minority

---

**2.** Professor LaFave points to the case of *Doe v. Renfrow,* 475 F.Supp. 1012 (N.D.Ind.1979), aff'd. in part, 631 F.2d 91 (7th Cir.1980) to illustrate his point that drug dogs do not always accurately disclose the presence or absence of narcotics. In *Renfrow,* a dog alerted on a 13–year-old student during a school-wide "sniff" of other students. The dog continued to alert even though the student emptied her pockets. This led to a body search where the student was required to remove all her clothing. No drugs were found, "but it was later discovered that the student had been playing that morning with her dog, who was in heat." 1 Wayne R. LaFave, Search and Seizure (3d ed. 1996), § 2.2(f), p. 455.

In the present case it was raised on appeal, but not developed at trial, that the dog in this case was trained also to alert on Valium.

groups, those who reside in less desirable or the least affluent neighborhoods, particularly, may be at risk that such surveillance techniques will be directed against them. Now officers will have absolute discretion to randomly walk dogs down any street, approach any person in the hallways of buildings, and sniff any exterior of a dwelling provided the officer conducts the scan from a common area. A free society cannot remain free if police may use drug detection dogs or any other crime detection device without restraint. The Fourth Amendment should be the restraint. Therefore, in my view, the use of a canine to scan the outside of a dwelling, even from a place the police have a right to be, is presumptively unreasonable without a warrant.

Furthermore, as the majority points out, some states have decided not to follow or extend *Place* and *Jacobsen* when interpreting their own state constitutions and have concluded that a dog sniff can be a search. *See* maj. op. n. 14 at 511. Moreover, 46 states now recognize a state constitutional exclusionary rule. Some states apply a reasonable suspicion standard and others apply a probable cause standard. *See New York v. Dunn*, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1058 (1990) ("To hold [that a canine sniff is not a search], we believe would raise the specter of the police roaming indiscriminately through the corridors of public housing projects with trained dogs in search of drugs"); *Pennsylvania v. Johnston*, 515 Pa. 454, 530 A.2d 74, 79 (1987) ("[I]t is our view that a free society will not remain free if police may use this, or any other crime detection device, at random and without reason.").

Here, because the majority concludes that the police had reasonable suspicion to conduct a canine sniff at Fitzgerald's door, it ultimately concludes that we need not decide the state constitutional question. In order to provide Maryland residents with greater protection against random canine sniffing searches, I believe we should reach the state constitutional question and declare canine sniffs of dwellings conducted on less than probable cause presumptively unreasonable. In addition, Maryland should adopt its own exclusionary rule.

Unlike the majority, I find persuasive the proposition that "the warrantless canine search of an apartment based on reasonable suspicion is illogical and improper." *Ortiz* at 830:

> Justifications stated by the court in *Com. v. Johnston,* 515 Pa. 454, 530 A.2d 74 (1987), and most others for the adoption of a reasonable suspicion standard are (1) in cases involving searches of public places or items such as luggage that are in transit, there is a diminished expectation of privacy in those items; (2) the concern that the utility of drug-detecting dogs will be lost if warrant procedures are required; and (3) the nature of the search is not intrusive, i.e., it does not require the opening of the object or the entrance to the place being searched and can only detect contraband.

Even the intermediate appellate court concluded that, "[t]here is no such half-way thing as a quasi-search of a residence requiring some lesser or intermediate justification." If the canine sniff is a search, the Fourth Amendment applies requiring a warrant based on probable cause. If is it not a search, the Fourth Amendment is inapplicable. *Fitzgerald v. State,* 153 Md.App. 601, 690, 837 A.2d 989, 1039 (2003). The proper standard, absent exigent circumstances, is a warrant supported by probable cause.

Here, because the drug detection activity infringes upon an individual's reasonable expectation of privacy in the home, that activity is *ipso facto* a search. The majority, however, is unable to reach that conclusion, primarily because of its reliance on the position that there is no reasonable expectation of privacy in contraband. I submit the Court should look beyond the substance at hand and focus on the core values embodied in the Fourth Amendment This case involves core Fourth Amendment protections: the right of the people to be secure in their homes from unreasonable governmental intrusion. If the majority feels constrained to find Fourth Amendment coverage in cases involving a canine sniff, the Court may find coverage under Article 26.

This case presents this Court with the opportunity to break with the tradition of reading Article 26 of the Maryland Declaration of Rights *in pari materia* with the Fourth Amendment. We should interpret Article 26, in such a fashion, so as to afford citizens greater protections than those as interpreted under the Fourth Amendment. There is, and should be, a heightened expectation of privacy in a dwelling. Second, there should be a lower expectation of privacy in luggage and other inanimate objects. Third, police do not lose the utility of drug detection dogs by requiring a warrant prior to the canine sniff of a dwelling. Finally, even though a canine sniff is less intrusive than opening doors or windows, the use of this technique, absent probable cause, dilutes the core protections embodied in the Fourth Amendment and Article 26 of the Maryland Declaration of Rights.

Chief Judge BELL has authorized me to state that he joins in this dissenting opinion.